UNITED STATES of America ex rel. John Francis BUTLER, Appellant,

v.

James F. MARONEY, Superintendent, State Correctional Institution, Pittsburgh, Pennsylvania.

No. 14016.

United States Court of Appeals Third Circuit.

Argued Jan. 10, 1963.

Decided June 25, 1963.

Rehearing Denied July 23, 1963.

---

1. See United States v. Countryman, 2 Cir., 311 F.2d 189.

Marjorie Hanson Matson, Pittsburgh, Pa., for appellant.

William Claney Smith, Asst. Dist. Atty., Allegheny County, Pittsburgh, Pa. (Edward C. Boyle, Dist. Atty. of Allegheny County, Samuel Strauss, Asst. Dist. Atty., Frank P. Lawley, Jr., Deputy Atty. Gen., Pittsburgh, Pa., on the brief), for appellee.

Before KALODNER, HASTIE and GANEY, Circuit Judges.

GANEY, Circuit Judge.

This case comes before this Court from the denial of the petition for writ of ⟩habeas corpus in the District Court for the Western District of Pennsylvania.

The appellant, John Francis Butler, was sentenced on May 5, 1958, by the Court of Oyer and Terminer of Northumberland County, to a term of from four to ten years for armed robbery which was to be served in the Eastern Penitentiary. While there interned, he made application for a writ of habeas corpus and a hearing was set for May 26, 1959, before Judge Troutman of Northumberland County. In the meantime, he had been transferred to the Western Penitentiary and was brought to Sunbury for

the hearing. At the time of hearing, the appellant withdrew his application for the writ, signed it, as did his counsel, and was to be returned the following day to the Western Penitentiary at Pittsburgh. On May 27, 1959, between 10:30 and 11:00 in the morning, the appellant was brought from the county jail with a belt around him through which handcuffs were attached, the belt being loose enough so that appellant had freedom of movement of his hands. The sheriff in charge of the prisoner was one James Lauer who had been sheriff of Northumberland County for eleven years. He was 5 feet 5½ inches tall and weighed about 245 pounds. He had asked a friend of his of some years standing, one Merlin Diehl, to go with him and drive his own Chrysler Windsor model car. Enroute to the Western Penitentiary, the appellant was seated in the rear seat alone. Merlin Diehl was driving the car and the sheriff was seated in the front seat alongside the driver and between them was a .38 caliber revolver lying on the seat with a newspaper covering it. They stopped at two gasoline stations along the way and a Howard Johnson restaurant where the appellant was permitted to leave the car, have something to eat, as well as go to the men's room, and they all returned to the car without incident. The handcuffs and belt were placed upon the appellant in the same manner as when they left the jail and the arrangement of the handcuffs with the belt permitted the appellant enough freedom of movement so that he might smoke cigarettes. When they reached the Perry interchange, on the Pennsylvania Turnpike, Merlin Diehl, the driver of the car, took the wrong route, going north instead of south, and, finally, after having determined he was on the wrong route, returned to Route 19 and proceeded in a southerly direction toward the Western Penitentiary. After they had proceeded a short distance in the right direction, it began raining very hard and, finally, it became so severe that they had to slow down to 10–15 miles per hour and, while proceeding slowly

downgrade, at about 5:30 p. m., the appellant lurched over the front seat, grabbed the pistol, which was lying on it, and, according to the only eyewitness, the driver of the car, Merlin Diehl, the sheriff grabbed at his arm and said, "John, don't do it.", to which the appellant replied, "Let me go, Jim, or I'll kill you." Aware of what was happening, Diehl drove the car to the side of the road, almost touching a side embankment, opened the door and came to the back of the car for the purpose of aiding the sheriff. As he opened the door, he saw the flash of a gun and heard a shot. The sheriff, at that time, was on the floor of the car, between the back portion of the front seat and the front portion of the rear seat, lying with his head facing Diehl and his face turned toward the front portion of the rear seat, partially on his right arm. He was specific as to the position of the sheriffs' body, saying definitely he was not in a half sitting position. As he opened the door, the sheriff's head came out, it apparently having been against the door.

Diehl testified that the appellant was on the opposite side of the car, in a crouched position, partially on the seat, and told him, "I'll get you." Diehl immediately ran a short distance from the scene, down over an enbankment and sought safety in a nearby garage with the appellant, Butler, in pursuit part of the way, when he veered off and ran into a wooded swampy section of the countryside. He hid out until the next morning at 6:00 a. m., giving himself up to State Police who were surrounding the area.

John McCallen, a witness who was a short distance behind the car driven by Diehl, passed the automobile and he could observe a portion of the decedent's head out of the car and saw the appellant running away from the scene. He heard no shot and immediately came back and with the help of some others who had gathered at the scene, helped to extricate the body of the decedent, Sheriff Lauer. The body of the decedent was so wedged in between the back portion of the front seat and the front portion of the back

seat that it was necessary to take out the back seat in order to remove the decedent.

The appellant was tried for murder and found guilty in the first degree. Under the Split Verdict Law of Pennsylvania, the jury was presented with evidence to determine the degree of punishment and they returned a verdict of death by electrocution. An appeal was taken to the Supreme Court of Pennsylvania, the conviction was sustained and a petition for certiorari to the Supreme Court of the United States was denied. The appellant then filed a petition for writ of habeas corpus in the United States District Court for the Western District of Pennsylvania, from the denial of which this appeal is taken.

█ The first contention of the appellant, that he was deprived of due process of law, concerns itself with the following. The Courts of Allegheny County had adopted a Rule Number 38, entitled "Records of Behavior Clinic", Sections 1 and 2 of which read as follows:

"Section 1. The record and reports of the Behavior Clinic, the pre-sentence and pre-parole reports of the Probation Office, and the pre-parole reports from the Workhouse, are confidential records of the court, to be used only by the court or the proper officers thereof under its direction. They are not to be exhibited to or examined by any other person except upon Order of Court after application in writing. Nothing in this rule shall be construed to interfere with the practice of the Behavior Clinic in furnishing the results of examinations to the District Attorney.

"Section 2. All persons accused of murder shall be examined by the Behavior Clinic and the report thereof shall be submitted to the court."

By Order of Court, dated April 25, 1960, upon the application of the District Attorney of Allegheny County, and after hearing held without notice to counsel for defendant, it was decreed "that either the prosecution or the defense is permitted to call as witnesses, any medical doctor or psychologist from the Behavior Clinic who has participated in an examination of the defendant, John Francis Butler. It is further ordered that the reports of said Behavior Clinic shall not be disclosed to either party prior to their appearance in court of the said witnesses. Rule 38 of the Court is hereby waived so that the jury and/or the Court may have available for its consideration such testimony."

The report was handed to counsel for the defendant during the first day of trial, May 16, 1957. It is appellant's contention that, in a murder trial, since counsel must be present in every stage of the proceeding, that counsel, not having been apprised of the District Attorney's application for waiver, a fundamental right was denied him, in that Dr. Davis of the Behavior Clinic was called and testified that at the time of the shooting the appellant was sane and knew the difference between right and wrong. It is the contention of the appellant that he was denied the opportunity to contest the waiver and, had he been given such opportunity, he might have been able to prevent Dr. Davis from testifying. However, since counsel for the appellant objected to the testimony of Dr. Davis when he was called as a witness, and made explicit her objection, and the court ruled against her, we see no merit in appellant's contention, and though counsel was not present at the time of waiver, no prejudice followed the court's action since counsel's objection at the trial had the same effect as though she had notice and made objection to the waiver at the time of the ruling on the application therefor.

█ The next contention of the appellant was that the trial judge, both during the course of the trial and in his charge to the jury, made repeated references to the fact that the Behavior Clinic was created by the court, thus, it is alleged, giving added weight to Dr. Davis' testimony. We see no merit in this contention either, since all the trial court did

was to make reference to the fact that the Behavior Clinic, who employed Dr. Davis, was the creature of the court and the references to it lent no undue sanction to his testimony.

▮ The next contention of the appellant wherein he alleges he was denied due process of law is in the court's refusal to grant his motion for the issuance of a subpoena for Judge Troutman, before whom the application for the writ of habeas corpus was to be held. The purpose of Judge Troutman's presence was to have him testify to a collateral matter concerning the appellant's withdrawal of his petition for the writ and, in no wise, had any bearing on the issues of the trial and, accordingly, we dismiss it.

▮ The main contention of the appellant concerns itself with the refusal by the trial judge to permit counsel for the appellant, during the trial, to examine the statement given to the police by the appellant in which was related an admission by Diehl that immediately after the appellant had grabbed the gun on the front seat, and the decedent had grabbed for his arm, a struggle ensued between the decedent and the appellant in the back seat during the interval it took for him to pull the car to the side of the road, after he became aware of what was going on. The statement was shown to the witness, Diehl, and marked for identification, but never offered in evidence, and upon demand by counsel for the appellant, the District Attorney refused to let appellant's counsel look at it, which refusal was sustained by the trial judge. After the verdict of guilty of murder in the first degree, in the jury's determination of punishment under the Pennsylvania Split Verdict Act,[1] the appellant, under cross-examination by the Commonwealth, was shown his statement and the related statement of Diehl that there was a struggle in the back seat.

A careful review of Diehl's testimony shows that Diehl not only never admitted to a struggle in the back seat while he was stopping the car, but carefully refrained from testifying to any occurrence in the back seat. On cross-examination, at one place, he stated he did not know how the decedent got over the front seat, that he heard no particular noises and that he "didn't hear a thing", although he did testify there would have to be some noise with the sheriff going over the back seat—which he later corrected to front seat—and that he heard no outcry or noise indicating pain. All of Diehl's testimony concerned itself with matters preceding the decedent's getting into the back seat and, accordingly, the jury had nothing before it indicating a struggle which was an area of vital importance to the defendant's case. Additionally, there was nothing in the record to substantiate the trial judge's charge that decedent "fell" over the front into the back seat. However, all indications surely point to a struggle in the back seat of the car in corroboration of Diehl's statement the morning after the crime and withheld from the jury by the prosecutor. It could not have been by accident or from a fall over the front seat that the body of this powerfully-built man of 5 feet, 5½ inches, weighing 245 pounds, became wedged on the floor between the rear seat and the back of the front seat, a space of 12½ inches, with the rear seat some 14 inches above the floor, with his head against the door so that when Diehl opened the car, it extended out beyond the door. The overall length of decedent's body was 5 feet, 5½ inches, or 65½ inches, and the width of the car measured, between the

---

**1.** The Act as amended provides: "After such verdict is recorded and before the jury is permitted to separate, the court shall proceed to receive such additional evidence not previously received in the trial as may be relevant and admissible upon the question of the penalty to be imposed upon the defendant, and shall permit such argument by counsel, and deliver such charge thereupon as may be just and proper in the circumstances. The jury shall then retire and consider the penalty to be imposed and render such verdict respecting it as they shall agree upon." 18 Purdon's Pa.Stat.Ann. § 4701.

rear doors, 5 feet, 7 inches, and in order to extricate the decedent's body, it was necessary to remove the rear seat of the car. Nor does the position of the appellant at the time Diehl opened the door detract, in any wise, from the shooting being the result of a struggle for Diehl repeatedly testified that as he was opening the door, he heard the shot and then saw the flash of fire and saw appellant partially sitting on the corner of the rear seat. There was only one shot fired and it entered the decedent's body at the upper left quadrant of the abdomen and was located at a level 41½ inches above that of the undersurface of the heel and 13 inches below that of the suprasternal notch, breastbone, and 6¼ inches to the left of the mid-line. It emerged from the right side of his body and struck the pillar separating the front door from the rear door on the left-hand side of the car, 10 inches above the floor. The physical facts belie Diehl's testimony at the trial, for it showed that the decedent was shot by the appellant while he was partially seated in the opposite corner of the car while the decedent was on the floor wedged between the rear of the front seat and the back seat. It is submitted that it would be physically impossible for the defendant to have fired the shot while partially seated in the rear corner of the car for the gun, in his hand, must have been at least 1 foot above the seat and to fire down at the decedent on the floor from this position would mean that the bullet never would have penetrated the decedent and come out 4 inches below the seat and dented the pillar described above, since the rear seat was 14 inches above the floor of the car. It is thus to be seen how extremely important the fact that there was a struggle in the back seat of the car becomes in the light of the appellant's testimony at the Split Verdict hearing that the shot was fired while he was struggling in the back seat of the car for the gun.

Had counsel for the appellant known of Diehl's statement, cross-examination might have revealed, with this in mind, many factors helpful to the appellant's case, challenging, if not materially weakening, Diehl's account of the fatal firing of the shot which might have resulted in appellant's conviction of a lesser degree of crime.

The defendant did not take the stand on advice of counsel because of a number of previous arrests and, accordingly, not until after the verdict and during the taking of testimony under the Split Verdict Rule did evidence of a struggle in the back seat come out.

This withholding by the Commonwealth of information impinging on a vital area in appellant's defense is a denial of the Due Process Clause of the 14th Amendment of the Constitution. In the latest expression by the Supreme Court of the United States, Brady v. Maryland, 373 U.S. 83 at p. 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963),[2] the Court said: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." This requires a reversal of the order of the district court.

■ While there must be a reversal here on the grounds above adverted to, there is an additional substantial ground for reversal. The trial judge permitted the reading to the jurors at the hearing under the Split Verdict Statute for determining the penalty to be imposed by them, inflammatory and extremely prejudicial statements made by a district attorney and a judge in a New York State case, which will be adverted to later.

In the construction of the Split Verdict Act, it is stated in Commonwealth v. McCoy, 405 Pa. 23, 30, 172 A.2d 795: "It is plain enough that the subject of evidence is not only not 'clearly expressed' in the Act's title, as required by Article III, section 3, of the State Constitution, P.S., but it is not even hinted at. The title in full reads as follows: 'An

2. Filed May 13, 1963.

Act Amending the act of June 24, 1939 (P.L. 872), entitled "An act to consolidate, amend and revise the penal laws of the Commonwealth," changing the method for determining the penalty to be imposed for the crime of murder of the first degree.' It actually amended Section 701 of 'The Penal Code' relating to degrees of murder and penalties, but not evidence. All that the amendment was designed to effect was to change the *method* for determining the penalty by having the evidence of the defendant's prior convictions for unassociated crimes excluded at trial until the jury's verdict on the question of the defendant's guilt or innocence was rendered and, upon the jury's finding the defendant guilty of murder in the first degree, the evidence of his prior convictions would then be offered as an aid to the jury in fixing the penalty."

Further, the court is particularly explicit in defining what testimony should be received in connection therewith. On page 35 of 405 Pa., on page 798 of 172 A.2d, Commonwealth v. McCoy, supra, the Court states: "No comment should be made by the court with respect to the evidence to be received; nor should such additional evidence be more than records of prior convictions, confessions and admissions of the defendant as hereinbefore indicated."

Nothing could be clearer from a reading of the Supreme Court of Pennsylvania's position with respect to the Split Verdict Rule that the only evidence properly to be received in connection therewith is that adverted to above.

However, the court permitted the following testimony to go before the jury in determining the degree of the defendant's guilt. Under an indictment in the State of New York, People v. John McCann—who is John Francis Butler, the defendant herein—on a charge of assault in the third degree, defendant being arraigned for sentence before the Honorable Owen W. Bohan on the 27th day of August, 1936, the following colloquy took place which was read to the jury:

"*The Clerk:* John McCann, what have you now to say why judgment of the Court should not be pronounced against you according to law?

"*The Court:* I will hear you.

"*Mr. Feldman* [of counsel for the defendant]: I understand the family on both sides are willing the boy should get married to the girl. He claims she told him she was nineteen. I did not see the girl. I do not know what she looks like, but that is the claim.

"*The Court:* He is no good. He only came out of State's prison and lived with this girl; had relations with her and diseased her."

Again, on an indictment charging the defendant with second degree robbery in November of 1933, in New York, the Court permitted the following colloquy by the District Attorney to be read to the jury:

"As a second offender, if he had been convicted of robbery in the 1st degree, he would have been sentenced to from 30 to 60 years with an additional 5 to 10 for the gun, which would have made it from 35 to 70 years. Taking a plea to robbery in the 3rd degree, with an additional 5 to 10 for the gun, he can be sent away for from 15 to 30 years.

"The defendant's actions since this plea was taken and my investigation of the kind of a man he is and has been, convince me that he is as dangerous a man to society as one could find in this city. I made no agreement with him whatsoever at any time concerning the additional 5 to 10 years for possession of the loaded weapon.

"In view of his past record and what I have learned about him since his plea, and in view of the fact that I have been advised by the Warden of the jail at 53rd Street that he was implicated in an attempt to break jail—and that break would have involved the killing of a great many keepers up there, and that was part

of the deliberate plan—I believe, your Honor, that a very severe sentence should be imposed upon this man from the point of view of the, District Attorney's office. I would like to make a recommendation on the record that the Parole Board be advised—"

In the same matter, the court, in pronouncing sentence, stated:

"In my opinion, this defendant is a cold-blooded stick-up man and a menace to the public. Were it not for the recommendation of the District Attorney, I would not only impose a 30 to 60-year sentence, but I would give him an additional 10 to 20 for the gun.

\*  \*  \*  \*  \*  \*

"In my opinion, he is a menace to the public, a menace to society, a recidivist, a confirmed criminal and beyond rehabilitation."

While it is nonetheless true that these statements of the prosecutor and the court were read to the jury in matters which occurred more than 20 years previously, they were not within the orbit of the rule laid down in Commonwealth v. McCoy, supra, but were hearsay of the worst order and served no other purpose but to inflame the minds of the jury to insist upon the death penalty rather than life imprisonment. In Commonwealth v. Butler, 405 Pa. 36, 54, 173 A.2d 468, the Supreme Court of Pennsylvania, in sustaining the appellant's conviction, referred to the comments offered and expressly said that they "should have been deleted for the purposes of this case", citing Commonwealth v. McCoy, supra. However, it said, further, that since appellant's counsel made no objection to the testimony nor made any motion to strike it out, it was not a matter of which the appellant could complain.

We think the reception by the trial judge of these comments and statements by the district attorney and judge, of another state, in different cases, disruptive of appellant's character, long years past, and purely their personal judgments, not being made part of the record of conviction, was a gross abuse of ordered concepts of justice, and violative of principles so elemental to reasoned norms of fairness, that counsel could not waive them by lack of objection.

█ Accordingly, for this reason we would, likewise, reverse the judgment of the district court and remand the case for the issuance of a writ of habeas corpus. However, nothing that is said here precludes a new trial or the taking of proper steps to hold the defendant in custody pending such new trial. United States ex rel. Thompson v. Dye, 3 Cir., 221 F.2d 763.

KALODNER, Circuit Judge (dissenting).

I would affirm the District Court's denial of the petition for a writ of habeas corpus for the reason that I do not find in the trial record the abuse of due process which the majority discerns. It is becoming increasingly apparent in these habeas corpus cases that the judicial concept of due process, like beauty, "is in the eye of the beholder."

In the instant case the majority takes the view, for example, that the withholding of the appellant's written statement to the police in which was recited Diehl's *oral* declaration to the same police in his presence "that there was a struggle in the back seat" was a violation of due process because "All of Diehl's testimony concerned itself with matters preceding the decedent's getting into the back seat and, accordingly, the jury had nothing before it indicating a struggle which was an area of vital importance to the defendant's case." I don't see how the majority can justify its determination in this respect since in its own statement of Diehl's testimony it recites that Diehl testified on direct examination that after the appellant had "grabbed the pistol \* \* \* the sheriff grabbed at his arm and said, 'John, don't do it.', to which the appellant replied, 'Let me go, Jim, or I'll kill you.'" If this statement does not disclose a "struggle" for the murder weapon I don't know just how one can describe a "struggle".

Moreover, the majority's statement that "the jury had nothing before it indicating a struggle which was an area of vital importance to the defendant's case" fails to take into account that (1) the defendant's sole defense was that of temporary insanity at the time of the shooting and not an accidental shooting in the course of a struggle; (2) that Dr. Walter Lindsay Jacob, appellant's psychiatric expert in both his direct and cross-examination related a story of a "struggle" at the time of the shooting which had been told to him by the appellant when he examined him in the course of his psychiatric study; and (3) the trial judge in discussing in his charge the testimony relating to the shooting stated "The written statement of the defendant only discloses that they were *struggling* closely together for the gun." [1]

On direct examination Dr. Jacob testified in relevant part in detailing the "case history" given to him by the appellant:

"All of a sudden I got the crazy idea to grab the gun. The thought entered my mind that I wanted to escape and if I didn't grab the gun in doing it, they would shoot me * * *

"Then he [appellant] states, with no other thought, he immediately, within a period of, he estimates, no more than ten seconds, he grabbed the gun and holster and the *struggle occurred*. Then following *the struggle*—do you want me to give his description of the *struggle*? I don't know whether you want it * * *

"By the Court: Go ahead give us his description * * *

"By Mrs. Matson [appellant's counsel]: Doctor Jacob, before we quit for our dinner recess you were just at the point of describing *the struggle which took place in the back seat of Sheriff Lauer's car*, as related to you by the defendant?

"A. That's right. One other point that I'd like to make clear, I am not a stenographer and this is not our conversation verbatim, but merely what I was able to write down as we were talking.

"Then Mr. Butler continued, stating that he reached over the seat, grabbed the gun and the holster. And just as I did, *the Sheriff came over the front seat after me.* He punched me twice, grabbed the hand —my hand with the gun. I and the Sheriff both had our hands on the gun. The Sheriff said to me, 'Give me the gun.' I said, 'Let me go. I'm only trying to run away.' We *continued to struggle.* He weighed about 250 pounds. *Finally he fell on the floor on the back, with me on top of him.* He had my hand. We were *still struggling* when the gun went off. I cannot recall consciously pulling the trigger. I'm not sure about his hands or my hands as to their exact positions." (emphasis supplied)

The foregoing is dispositive of the majority's holding that the appellant was deprived of due process because of its view that the failure to permit his counsel to examine his statement to the police resulted in the withholding from the jury of "evidence of a struggle in the back seat of the car."

Dr. Jacob's testimony placed before the jury in graphic manner the appellant's own version of the "struggle" between the murdered sheriff and the appellant which started on the front seat and ended in the back of the car. Diehl's version on the witness stand was in substantial accord. He stated on cross-examination that the sheriff had gone "over the back seat" and he described how the sheriff was shot while in the back of the car. It is difficult to understand the majority's view that Diehl had lied in his testimony. It is equally difficult to understand the apparent view

---

1. While the trial judge erred in referring to the "written statement" inasmuch as it had not been introduced in evidence it certainly did not prejudice the appellant.

of the majority that it was a matter of life-or-death importance whether the struggle was on the front or back seat or the front or rear of the car.

There was in this case no suppression of evidence by the state disclosed by after-discovered evidence as appeared in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) since there was no critical difference between what Diehl said on the witness stand and what he said in his oral statement to the police.

The fact that Diehl did not use the word "struggle" in describing how the sheriff "grabbed" the appellant's arm after he had seized the gun and went "over the back seat" in an effort to wrest it loose from the appellant's hold, although he had done so in his oral statement is absolutely irrelevant.

As the Supreme Court of Pennsylvania pointed out in Commonwealth v. Butler, 405 Pa. 36 at pages 49–50, 173 A.2d 468, at page 475 (1961):

" * * * the defense to the crime was not accidental killing. It was excusable homicide as a result of insanity. Needless to say, such are miles apart. More importantly, a reading of the record discloses no significant variance as alleged. In Diehl's statement given immediately after the occurrence, as quoted in the cross-examination of the defendant, he said, 'The sheriff got into the back seat and there was a struggle while I was trying to get the car stopped on the side of the road.' During his testimony on the stand, Diehl did not use the word 'struggle' but he did say that almost immediately as the defendant gained possession of the gun, the sheriff 'grabbed him' and went over the seat before the car was brought to a stop. Certainly, this clearly indicates a struggle took place. But when the fatal shot was fired after the car had been stopped, Diehl testified that Lauer [the sheriff] was then lying on the floor and the defendant was sitting on the seat on the opposite side of the car. There is nothing in Diehl's first statement, as disclosed in the record, that is at variance in the slightest degree with this testimony."

On the score of the "inflammatory and extremely prejudicial statements" made in the New York case which the majority has cited as "an additional substantial ground for reversal" it need only be said that they were offered in evidence without any objection by appellant's counsel, described by the Pennsylvania Supreme Court as "a thorough, discerning lawyer of extensive experience"; there was no motion to strike after the statements were read; and appellant's counsel had in fact stated she had "no objections to Mr. Strauss reading the Judge's remarks providing he [the prosecuting attorney] reads the entire statement including the remarks of the District Attorney." As the Supreme Court of Pennsylvania noted, 405 Pa. 54, 173 A.2d 477, the New York record contained data relating to the appellant's "early home life and difficult environment" which his counsel might well have considered helpful to the appellant.