UNITED STATES of America,
Plaintiff-Appellee,

v.

Upton PEARSON, Jr. and Edward Johnson, Jr., Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Edward JOHNSON, Jr., Defendant-Appellant.

Nos. 29260, 29454.

United States Court of Appeals,
Fifth Circuit.

Sept. 21, 1971.

Rehearing and Rehearing En Banc
Denied Nov. 4, 1971.

Fred L. Banks, Jr., Jackson, Miss. (Court-appointed), for Upton Pearson, Jr.

W. S. Moore, Jackson, Miss. (Court-appointed), for Edward Johnson, Jr.

Robert E. Hauberg, U. S. Atty., E. Donald Strange, Daniel E. Lynn, Asst. U. S. Attys., Jackson, Miss., for the United States.

Before RIVES, THORNBERRY and CLARK, Circuit Judges.

RIVES, Circuit Judge:

In No. 29260, Pearson and Johnson were jointly indicted and convicted of transporting in interstate commerce a motor vehicle knowing that it had. been stolen in violation of 18 U.S.C. § 2312. In No. 29454, Johnson alone was indicted and convicted under 18 U.S.C. § 922(g) (1) of transporting firearms in inter-state commerce after he had been con-victed of a felony.[1]

One result of the two separate trials is that this Court is presented with some-what different versions of the facts per-taining to an alleged illegal search and seizure, each version being entitled to the same weight and legal presumptions. Under either version, able appointed counsel by careful analysis and cogent ar-gument urge that the search and seizure were not legal. We therefore discuss the evidence in much detail. However, we ultimately reach the conclusion that the entirety of the facts and circumstances

---

1. Pearson and Johnson will usually be referred to as the defendants.

justified the search and seizure and that affirmance is in order, subject to defendants' motions for judgment n. o. v. or for a new trial.

On those motions, we hold that the evidence (confined, because of the Government's claim of executive privilege, to six trials all occurring in the same week) is insufficient to establish *prima facie* the defendants' claim of systematic misuse of the Government's peremptory challenges so as to exclude Negroes from petit juries.

In each case the evidence of guilt is more than substantial. Both men were found in a vehicle which had been stolen in another state less than 48 hours previously, and two rifles and suspicious tools were found in the vehicle. An agent of the Federal Bureau of Investigation testified as to inculpatory statements each defendant made to him. In Johnson's separate trial there was introduced a record of his prior felony conviction in a federal court.

### I. *The Motions to Suppress.*

The defendants moved to suppress the rifles found in the vehicle and the vehicle identification number taken from the driver-side door post after the vehicle was impounded. A joint hearing was held on the motions to suppress, and the motions were denied.

### A. *Factual Background.*

At approximately 3:00 A.M. on July 31, 1969, two Jackson, Mississippi, police officers, Jimmy L. Davis and Edwin S. King, stopped a 1960 Chevrolet. Johnson was the driver; Pearson and another man, Jason S. Martin, were passengers. On the rear floorboard were found two rifles and a military type duffel bag containing a crowbar, hammer, hacksaw, and screw driver. The Government contends that these items were "burglary tools." Defendants contend that neither the tools nor the rifles were in plain view and that there was no justification to search for them.

Three witnesses, Johnson, Pearson and Officer Davis, testified at the motions hearing. Davis testified that he and his partner were on a burglary detail, there having been two recent burglaries in the area. Johnson's car had presumably stopped at an intersection, and Davis first noticed it when it pulled away with the tires squealing and the lights off. The police by use of flashing lights and a siren pulled the car over, and Johnson and Officer Davis got out of their respective cars. Johnson exhibited his driver's license, a Louisiana license, and Officer Davis noted that the vehicle had a Louisiana tag. Davis said he informed Johnson that he was charging him with making an "improper start," [2] but did not start writing out a ticket because Johnson had asked him for directions and he was responding.

After Davis and Johnson had been talking for some two minutes, Officer King, who had gone to the right-hand side of the civilian vehicle, shouted a warning that there were guns in the car. Davis did not know exactly what King had done prior to this time, but he did recall that King flashed a light into the vehicle. When the warning was shouted, Davis drew his pistol and stepped back from Johnson.

Johnson's testimony substantially matched that of Davis. He could not testify as to what Officer King had done,

---

2. Davis testified that Johnson was eventually charged with making an "improper start," a city ordinance violation. This record reflects no ordinance, but we are pointed to the following section of the Mississippi Code of 1942:

§ 8191: " * * * No person shall start a vehicle which is stopped, standing, or parked unless and until such movement can be made with reasonable safety."

Pertinent also is § 8229–01, which reads in part:

"(a) * * * Every vehicle upon a highway within this State during the period from sunset to sunrise and at any other time when there is not sufficient light to render clearly discernible any person on the highway at a distance of five hundred (500) feet ahead shall be equipped with lighted front and rear lamps * * *."

but he said that the rifles were on the rear floorboard under a blanket.

The only light shed on Officer King's actions was provided by Pearson. He testified that he was in the rear seat and that Martin was in the front.[3] King approached the car and asked for identification. Pearson handed him his identification. He and Martin remained in the car. King asked Pearson where he worked, Pearson responded, and Martin was then asked for his identification. King then flashed a light into the car and saw the duffel bag. He asked what the bag contained, and Martin showed him. The rifles were under a blanket on the rear floorboard, and the duffel bag was on top of the blanket.

Pearson was uncertain as to the time sequence when King saw the rifles, when the car door was opened (or who opened it), and when the occupants were told to get out of the car. He did not know when or if King lifted the blanket. But he did testify that King asked what was under the blanket, and that some thirty seconds elapsed after King saw the tools before anything else happened.

The only man who could have authoritatively testified as to what Officer King did or did not see and do was King himself, and though the record indicates that he was present at the hearing he was not called upon to testify.

Prior to the arrests the Police officers had no knowledge that the vehicle was stolen or that Johnson had a felony record. There is no documentation of the charges appellants were booked on by the city police. There is some indication, and it was apparently assumed by all of possessing firearms and burglary tools. The most informative statement concerned, that appellants stood accused was made by Officer Davis who said that Johnson was charged with a traffic violation and that the charge was "possession of burglary tools, both of them, possession of burglary tools and investigation."

The motions to suppress were denied by the district court in the following language:

"It seems to me that these firearms were sufficiently in the open to have been observed by the Officer without a search warrant and I understood one of the defendants to say this bag, this tool bag, I believe they call it a naval tool bag held it up for one of the officers who saw a hacksaw, a hammer, a screw driver and a crowbar and etc., in there which is said to be burglary tools. The testimony shows to my satisfaction that these people were lawfully arrested and I believe the search that was made was a search made incident of whatever may have been discovered but again I think this is a question that the jury should be called upon to pass upon in connection with their guilt or innocence because this evidence if illegally seized of course it wouldn't be available it couldn't be used, so I believe I'll overrule the motion of Upton Pearson, Jr., and the two motions of Edward Johnson, Jr. to suppress." [R. 46–47.]

 In order to determine whether reversible error was committed by the ruling on a motion to suppress, we must look not only at the evidence introduced on the hearing of the motion but also at the evidence brought forth on the trial. Evidence adduced at trial may be considered even though the evidence on the motion to suppress was insufficient to justify the search. Carroll v. United States, 1925, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543; Rent v. United States, 5 Cir. 1954, 209 F.2d 893, 896.

In the first trial, the one for the Dyer Act violation, there was no further or differing evidence concerning the arrests. Officer King did not testify, but the Government is not to be faulted for

---

3. This differs from Officer Davis' testimony on the motion hearing and from Officer King's testimony on Johnson's separate trial for the firearms offense. Both officers placed the two men in reverse position.

this. King's testimony was particularly relevant as to the rifles. Reference to the rifles was sought to be avoided, since defendant Pearson was not accused of having anything to do with them. The propriety of the search and arrests must stand or fall on the evidence at the hearing on the motions to suppress.

In the second trial, the one for interstate transportation of a firearm by a felon, which concerned only Johnson, Officer King was finally called as a witness. He was called by the defense, the Government having rested without calling him. King testified that he approached the car on the right-hand side and asked the man in the rear seat (who he said was Martin) for identification. The man handed his identification through the window, and as King was checking it with his flashlight he saw the rifle butts sticking out from under the blanket. He then asked the occupants to get out of the car, and he did not see the duffel bag until they did so.

The three men in the car were arrested and the car was impounded. The next morning, Federal Bureau of Investigation Agent Edgar L. Martin entered the case. He testified that from the National Crime Information Center, a type of clearing house through which stolen property is reported and identified, he had been informed the vehicle was stolen. He went to the police lot to check the vehicle identification number to positively identify the car, and said he had not talked to any city police officers about the case nor seen the arresting officers' report prior to inspecting the vehicle.[4]

After checking the number, Agent Martin interrogated Johnson and Pearson. They were provided the Miranda warnings[5] and there was no objection to the introduction of their statements as

being involuntary. Johnson admitted driving the car to Jackson from New Orleans and transporting the rifles. He did not admit stealing the car, but said he got it from a man he barely knew and could not produce as a witness. Pearson admitted driving the car for a short way on the trip and knowledge that it was stolen.

### B. Burden of Proof—Authority to Stop Vehicle and to Arrest Defendants.

The Supreme Court has recently emphasized the disfavor attached to warrantless searches. In Coolidge v. New Hampshire, 1971, 403 U.S. 443, 454, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, the Court stated:

"[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption * * * that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.'" (Footnotes omitted.)

There was no search warrant in these cases, and the burden of establishing the reasonableness of the search was therefore on the Government.[6] It had the burden of establishing that the arrests were made with probable cause. Since the arrests were made by State officers, we must look to State law to determine their authority. United States v. Di Re, 1948, 332 U.S. 581, 589, 68 S.Ct. 222,

---

4. How the National Crime Information Center or Agent Martin knew what car had been recovered so that a report could be made that *this vehicle* was stolen is not explained.

5. Pearson signed a waiver of rights form. Agent Martin testified that Johnson did

not sign any waiver, but read the form, stated he understood it, and expressed a willingness to talk anyway.

6. United States v. Jeffers, 1951, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59; Williams v. United States, 5 Cir. 1967, 382 F.2d 48.

92 L.Ed. 210. Section 2470, Mississippi Code of 1942 (amended, Laws 1968, ch. 355, § 1) gives a law officer authority to arrest without warrant a person who commits any indictable offense in his presence.

█ Defendants contend that the officers had no authority to stop the vehicle for the traffic violation. Their argument is that the state statute giving them authority to enforce traffic violations uses the term "highways" but does not cover arrests made on "city streets." Further, since Mississippi courts do not take judicial notice of city ordinances,[7] and no ordinance was offered in evidence, a city ordinance cannot justify the arrests. We think the argument has no merit. State law does not draw a distinction between highways and city streets, and the city officers had authority to arrest persons violating state traffic laws within their jurisdiction.[8]

█ We think also that the officers had authority to stop the vehicle for investigation because of its presence in the area where burglaries had recently been committed, the time of night—about 3:00 A.M., the squealing of tires, and driving for some distance without headlights.[9] Under the holdings in *Terry* and *Sibron,* we think that shining the flashlight into the automobile,[10] making inquiry as to the contents of the duffel bag, and lifting the blanket which covered the rifles did not exceed the limits of a reasonable and proper investigation when all of the facts and circumstances are considered.

### C. *Basis for Arrests: State Criminal Statutes.*

There are two State offenses which might justify the arrests—the possession of burglary tools and the possession of the rifles.

### (1) *Possession of Burglary Tools.*

The Mississippi statute prohibiting the possession of burglary tools speaks of two types of tools—those "designed to aid in the commission of burglary" and those "peculiarly adapted to aid in the commission of burglary."[11] Where, as here, the tools are common and susceptible of legitimate use,[12] it is doubtful whether possession alone is sufficient to establish the commission of a crime. The Mississippi courts have read into the statute the requirement of some indication that the possessor intended to commit a crime.[13]

7. Bohannan v. City of Louisville, 1932, 164 Miss. 97, 144 So. 44; McDaniel v. City of Grenada, 1965, 252 Miss. 16, 172 So.2d 223.

8. §§ 8137(a) and 8150, Miss.Code of 1942.

9. *See* Terry v. Ohio, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; Sibron v. New York, 1968, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917.

10. *See* Williams v. United States, 5 Cir. 1968, 404 F.2d 493; United States v. Lee, 1927, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202; United States v. Williams, 5th Cir. 1971, 446 F.2d 486.

11. § 2044, Miss.Code of 1942:
"It is unlawful for any person to have in his possession implements, tools or instruments designed to aid in the commission of burglary, larceny or robbery; and on the conviction of any person thereof, he shall be punished by imprisonment in the penitentiary not exceeding five (5) years, or in the county jail not exceeding one year. The carrying concealed about one's person, or in one's baggage, implements, tools, or instruments peculiarly adapted to aid in the commission of burglary, larceny or robbery, shall be prima facie evidence of intention to use them for such purpose."

12. The tools were a crowbar, hammer, screw driver and hacksaw.

13. Fuqua v. State, 1962, 246 Miss. 191, 145 So.2d 152, appeal dismissed and cert. denied, 372 U.S. 709, 83 S.Ct. 1018, 10 L.Ed.2d 125, rehearing denied, 373 U.S. 947, 83 S.Ct. 1536, 10 L.Ed.2d 703; Johnson v. State, 1962, 246 Miss. 182, 145 So.2d 156, appeal dismissed and cert. denied, 372 U.S. 702, 83 S.Ct. 1018, 10 L.Ed.2d 125 (connected case). The annotation to § 2044, Miss.Code of 1942, reveals no case where a conviction has been sustained for possession of common tools of this nature without proof of other more incriminating items or other circumstances indicating a felonious intent.

**(2)** *Possession of Rifles.*

Section 2079, Miss. Code of 1942, prohibits the carrying of certain concealed weapons and defines the offense as follows:

> "Any person who carries concealed in whole or in part, any bowie knife, dirk knife, butcher knife, switchblade knife, metallic knuckles, blackjack, slingshot, pistol, revolver, or any rifle with a barrel of less than sixteen (16) inches in length, or any shotgun with a barrel of less than eighteen (18) inches in length, machine gun or any fully automatic firearm or deadly weapon, or any muffler or silencer for any firearm, whether or not it is accompanied by a firearm * * *."

Laws of 1960, ch. 242, § 1; 1962, ch. 310 § 1. Prior forms of the statute did not prohibit the carrying of rifles. The only firearms listed were pistols.[14]

One quick glance at these bolt-action full barrel rifles would have been enough to inform an officer that their possession was not prohibited under Mississippi law. The fact that they were loaded is irrelevant under the statute.

■ However, the possession of these rifles, though legal in itself, adds to the existence of probable cause to make the arrests for the possession of burglary tools. There are other indications of felonious intent in the possession of the tools—presence in the area where burglaries had recently been committed, the time of night—about 3:00 A.M., the squealing of tires and driving for about a block without lights. The entirety of facts which make up probable cause may be greater than the individual elements. The facts here rise above suspicion. They lead inescapably to the conclusion that the officers had probable cause to make the arrests for the possession of burglary tools, and that the search incidental to that arrest was reasonable.

**C.** *Vehicle Identification Number.*

■ This Circuit has held that where no harm is done to the vehicle, the warrantless checking for its vehicle identification number is not illegal. United States v. Johnson, 5 Cir. 1969, 413 F.2d 1396, on rehearing en banc, 431 F.2d 441. The two requisites for such a check are that the law enforcement officers have a reason for checking and that they have legitimate access to the vehicle. Both requisites are present here. Agent Martin had a reason for checking because he had been informed by the National Crime Information Center that the vehicle was stolen. He had legitimate access to the vehicle because it had been legally impounded. *See* Cooper v. California, 1967, 386 U.S. 58, 61, 87 S.Ct. 788, 17 L.Ed.2d 730.

We conclude that the defendants' motions to suppress were properly denied.

**II.** *Post Trial Motions.*

■ By their motions for judgments of acquittal n. o. v. and in the alternative for new trials, the defendants, Negroes themselves, claim that the Government discriminatorily used its peremptory challenges to remove Negroes from the trial jury. Clearly such a claim cannot be established by proof of the

---

In McCollum v. State, Miss.1967, 197 So.2d 252, officers were aware that a burglary had just been committed and that a dark 1957 or 1958 Chrysler with three occupants had been the only car seen in the area. The defendants' car matched this description, and several crowbars, hammers, a bolt-cutter, and a wire-apparatus described as a burglar alarm jumper were seen on the rear floorboard; Corn v. State, 1964, 250 Miss. 157, 164 So.2d 777, possession of several tools including a sledge hammer to which a chisel had been welded, and defendants sold a record player (brand new and in original case) valued at $35.00 for $3.00 cash and $2.00 worth of gasoline; Fuqua v. State, *supra*, Johnson v. State, *supra*, possession of two spotlights, one flashlight, keyhole flashlight, two loaded pistols, police sergeant's badge, 150 skeleton keys for various kinds of automobiles, juke boxes and pay telephones.

14. The prior statutes listed a number of weapons, including pistols and "other deadly weapon[s] of like kind or description." We have found no case indicating that this phrase was interpreted to include rifles.

Government's striking of Negroes in any one case. In Swain v. Alabama, 1965, 380 U.S. 202,[15] 221, 222, 85 S.Ct. 824, 836, 13 L.Ed.2d 759, the Court said:

" * * * we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, *pro tanto*, would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a' great many uses of the challenge would be banned.

"In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the per-

emptory challenge system as we know it." [16]

Continuing, however, the Court said that a claim of systematic exclusion of Negroes from serving on petit juries by the State's use of its peremptory challenges "raises a different issue and it may well require a different answer." 380 U.S. at 223, 85 S.Ct. at 837.

"We agree that this claim raises a different issue and it may well require a different answer. We have decided that it is permissible to insulate from inquiry the removal of Negroes from a particular jury on the assumption that the prosecutor is acting on acceptable considerations related to the case he is trying, the particular defendant involved and the particular crime charged. But when the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on added significance. Cf. Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. In these circumstances, giving even the widest leeway to the operation of irrational but trial-related suspicions and antagonisms, it would appear that the purposes of the peremptory challenge are being perverted. If the State has not seen fit to leave a single Negro on any jury in a criminal case, the presumption protecting the prosecutor may well be overcome. Such proof might support a reasonable inference that Negroes are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial and that the peremptory system is be-

15. While *Swain* involved the equal protection clause of the Fourteenth Amendment and these cases involve the due process clause of the Fifth Amendment, we perceive no difference in result.

16. Followed in United States v. Williams, 5 Cir. 1971, 446 F.2d 486. *See also* Davis v. United States, 5 Cir. 1967, 374 F.2d 1, 5.

ing used to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population. These ends the peremptory challenge is not designed to facilitate or justify."

380 U.S. at 223, 224, 85 S.Ct. at 837.

The Court did not further pursue or actually decide [17] the issue thus discussed because the record

"* * * does not with any acceptable degree of clarity, show when, how often, and under what circumstances the prosecutor alone has been responsible for striking those Negroes who have appeared on petit jury panels in Talladega County. The record is absolutely silent as to those instances in which the prosecution participated in striking Negroes, except for the indication that the prosecutor struck the Negroes in this case and except for those occasions when the defendant himself indicated that he did not want Negroes on the jury. Apparently in some cases, the prosecution agreed with the defense to remove Negroes. There is no evidence, however, of what the prosecution did or did not do on its own account in any cases other than the one at bar."

380 U.S. at 224, 225, 85 S.Ct. at 838.

Mindful of the ruling in *Swain*, the defendants sought to establish the general practice of the prosecutor.

A hearing was held; the defendants sought to call the prosecuting attorney to testify. He was personally willing, but thought it necessary to seek permission from the Department of Justice under 28 C.F.R. § 16.12.[18] The Department objected to the prosecutor's being questioned as to his mental processes, but was willing to permit him to testify concerning notes he had made relative to his peremptory challenges. In the hearing on January 14, 1970, the prosecutor stated:

"I knew yesterday that the defendants did desire to put me on the stand which I personally had no objection but I felt it necessary to clear the matter with the Department of Justice which I did late yesterday afternoon and reported that to the Court. The Department does not desire for me to take the stand to be questioned as to my thought processes as to why we exercised preemptory [sic] challenges in this case and the other cases, however, they did advise me to make a statement of fact which I am prepared to do to the best of the notes that I did keep and make have [sic] them available. Beginning Monday, January 5th, 1970, there were six cases tried in this court. * * * [Supp. R., 18 and 19.]

"* * *, I might make one more statement that might simplify things for counsel there. I don't recall any particular case prior to last week as to how many whites or coloreds that were preemptorily [sic] challenged by the government or the other side * * *." (Supp.R., 32.)

The Court in *Swain* saw no reason "why the defendant attacking the prosecutor's systematic use of challenges against Negroes should not be required

---

17. It clearly indicated its views, but we note Mr. Justice Harlan's brief concurrence:

"In joining the opinion of the Court, I deem it appropriate to emphasize my understanding that the Court reserves, and does not decide, the question which in Part III of its opinion it finds not presented by the record in this case." 380 U.S. at 228, 85 S.Ct. at 840.

18. "§ 16.12. *Production prohibited unless approved by the Attorney General.*

"No employee or former employee of the Department of Justice shall, in re-sponse to a demand of a court or other authority, produce any material contained in the files of the Department of Justice or disclose any information relating to material contained in the files of Department of Justice or disclose any information or produce any material acquired as a part of the performance of his official duties or because of his official status without the prior approval of the Attorney General."

See United States ex rel. Touhy v. Ragen, 1951, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417.

to establish on the record the *prosecutor's conduct in this regard,* especially where the same prosecutor for many years is said to be responsible for this practice and *is quite available for questioning on this matter."* (Emphasis added.)

█ We emphasize that it is "conduct" on which the prosecutor should be available for questioning. The Court did not indicate that the prosecutor could be questioned as to his thought processes.[19] That would be inconsistent with the peremptory challenge system. It might also be requiring the prosecutor to testify as to whether he had committed a crime.[20]

█ We conclude that the ruling of the Department of Justice did not improperly deny the defendants an opportunity to meet their burden under the rationale expressed by Chief Justice Vinson in United States v. Reynolds, 1953, 345 U.S. 1, 12, 73 S.Ct. 528, 534, 97 L.Ed. 727:

> "* * * since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense."[21]

The prosecutor's retained notes covered only the trials during the week that Johnson and Pearson were tried. The following is a synopsis of his statement supplemented by the testimony of an attorney who participated in one case.[22]

(a) White defendant—four Negroes on panel; Government challenged three Negroes and three whites;

(b) white defendant—three Negroes served on trial jury;

(c) Negro defendants—five Negroes on panel; Government challenged five Negroes and one white woman;

(d) Negro defendant—seven Negroes on panel; Government challenged five Negroes and one white woman;

(e) white defendant—five Negroes on panel; Government challenged six whites;

(f) Negro defendant—number of Negroes on panel unknown but all were challenged by Government.

The trials listed as (c) and (d) above are the trials involved in this appeal. The white woman excused in these trials held a law degree from another state. She did not sit on a single jury during the week.

A reasonable conclusion to be drawn is that the Government permitted Negroes to remain on the jury when the defendant was white, and challenged as many Negroes as possible (with the exception of one challenge used for the white woman lawyer) when the defendant was black. This evidence is consistent with defendants' contention that the Government's challenges were imper-

---

19. Professor Wigmore speaks of an "Alabama Doctrine" that testimony as to one's own intention or other state of mind should be forbidden as based upon "supposed principles" which have been generally repudiated. VII Wigmore on Evidence, 3rd ed. §§ 1965, 1966.

20. "§ 243. *Exclusion of jurors on account of race or color*
"No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude; and whoever, being an officer or other person charged with any duty in the selec-

tion or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000." 18 U.S.C.

21. *See also* Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103; Brady v. Maryland, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215; United States v. Andolschek, 2 Cir. 1944, 142 F.2d 503; United States v. Coplon, 2 Cir. 1950, 185 F.2d 629; 8 Wigmore on Evidence (McNaughton Rev.) §§ 2224, 2379.

22. In each case the Government was allowed six peremptory challenges and the defendant or defendants were allowed ten. See Rule 24(b), Fed.R.Crim.P.

missibly used. We do not read *Swain* as meaning that the attack on the Government's use of its challenges must fail if the impermissible use is not exercised one hundred percent of the time (compare 380 U.S. 206, 85 S.Ct. 824, 13 L.Ed. 2d 759).

Counsel for defendants were given additional time to ascertain whether further evidence could be produced. At the same time the Government conceded, and the district court indicated, that no records were kept on the Government's use of its challenges and that obtaining additional evidence would be difficult.

A line of cases has condemned prosecutorial misconduct relating to the use or suppression of evidence.[23] Unfairness to the accused was recognized even though the action by the prosecution may have been the result of negligence rather than bad faith. Brady v. Maryland, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed.2d 215. There are other cases discussing the problems of what evidence must be disclosed to the defense.[24] Since we are not concerned with evidence going to the issue of guilt or innocence, those discussions may be of limited assistance.

The concern of cases dealing with the prosecution's withholding evidence is that "prosecutorial misconduct which violates civilized notions of fairness and thereby taints the entire criminal process" should not be tolerated. Levin v. Clark, 1968, 133 U.S.App.D.C. 6, 408 F.2d 1209, 1211. Systematic improper striking of juries may, no less than other prosecutorial misconduct, taint the criminal process.

In *Swain, supra,* the evidence went back for some fifteen years. There, however, the defendants' fatal omission was in failing to fasten responsibility upon the Government. Here that omission has been supplied, and it can reasonably be argued that the courts should be liberal in holding that defendants have established the claim of systematic exclusion *prima facie* if *Swain's* approach to the problem is to be workable.[25] The burden of proof faced by defendants is most difficult. It might require checking the docket for a reasonable period of time for the names of defendants and their attorneys, investigation as to the race of the various defendants, the final composition of the petit jury and the manner in which each side exercised its peremptory challenges. We can well understand how the present defendants' counsel were unable to produce additional evidence. In the six years which have passed since *Swain,* we have not found a single instance in which a defendant has

23. *See, e. g.,* Mooney v. Holohan, 1935, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791; Pyle v. Kansas, 1942, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214.

24. *See* Ashley v. Texas, 5 Cir. 1963, 319 F.2d 80; United States ex rel. Butler v. Maroney, 3 Cir. 1963, 319 F.2d 622; Levin v. Clark, 1968, 133 U.S.App.D.C. 6, 408 F.2d 1209.

25. See the thought-provoking note of Mr. Gary L. Geeslin on Peremptory Challenge-Systematic Exclusion of Prospective Jurors on the Basis of Race in 39 Miss.L.J., pp. 157–165, from which we quote brief extracts:

"Regardless of how many veniremen there are of defendant's race, if none actually serve on the jury because they are peremptorily challenged, then a form of systematic exclusion has occurred and the intent and purpose of an entire line of decisions has been thwarted. * * *

\*　　\*　　\*　　\*　　\*

"If the decision were merely one between the constitutional claim of equal protection and the non-constitutional claim of the unbridled use of the peremptory challenge, there would be little left for deliberation, since Marbury v. Madison[14] held that the Constitution

"14. 5 U.S. (1 Cranch) 137, 178 [2 L.Ed. 60] (1803).

compels a choice of the constitutional claim over the non-constitutional claim when the two are drawn in conflict.[15]

"15. Swain v. Alabama, 380 U.S. 202, 244 [85 S.Ct. 824, 13 L.Ed.2d 759] (1965) (dissenting opinion)."

The note further expresses the conclusion that the "nearly insurmountable burden of proof" imposed on a defendant by *Swain* makes its approach to the problem "virtually unworkable." p. 163.

prevailed on this issue.[26] Nonetheless, the burden is not insurmountable. The testimony and notes of the prosecutor covering a period of time of one week are entirely too slender to overcome the presumption that an official of the United States has faithfully discharged his duties in a fair, even and constitutional manner. We find no error in the denial of the defendants' post-trial motions. The judgments of conviction are

Affirmed.

### ON PETITION FOR REHEARING AND PETITION FOR RE-HEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled in rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

---

26. A rule requiring the keeping of a simple factual record by the court clerk or actual systematic keeping of such a record by the prosecutor, by defense counsel, or by some association would alleviate the difficulty.