**UNITED STATES of America**

v.

**Carolyn S. McDANIELS et al.**

**Crim. No. 72–330.**

United States District Court,
E. D. Louisiana.

May 22, 1974.

# 1244

■■■■■■■

James D. Carriere, Cornelius J. Heusel, Asst. U. S. Attys., for plaintiff.

Richard Sobol, Washington, D. C., Ann Pardee Buxton, David J. Dennis, New Orleans, La., Jack Greenberg, Charles S. Ralston, New York City, Richard T. Seymour, Washington, D. C., for defendants.

ALVIN B. RUBIN, District Judge:

The defendant, Mrs. Carolyn S. McDaniels, was convicted of three counts of mail fraud and one count of welfare fraud by a jury composed of 11 persons of the white race and 1 person of the black race. In choosing the jury, the government used all 6 of its peremptory challenges to excuse persons of the black race. Mrs. McDaniels now seeks a new trial, arguing that the government's action violated her constitutional right to due process of law under the Fifth Amendment and her right to trial by an impartial jury. The court finds that her constitutional rights were not abridged but grants the motion under the provisions of Rule 33, Federal Rules of Criminal Procedure, because the interest of justice requires a new trial.

## I

Counsel for Mrs. McDaniels developed the evidentiary basis for this motion by a painstaking analysis of the court records for the last two years. With the aid of the Clerk's office and the U. S. Marshal's office, counsel first identified each case involving a black defendant that has proceeded to trial before a jury in this district since January 1, 1972. From the venire list in the record of each case, counsel took the names of jurors who served and who were challenged. Counsel and court personnel then sifted through several thousand jury questionnaires and, in some cases, checked parish voter's lists to determine the racial identity of each serving and challenged juror. There were 53 such trials, but in four it was not possible to obtain a complete breakdown of the government's challenges by race without considerable additional effort. In two of these four, however, some data on the racial composition of the jury was available. No data were collected with respect to cases involving white defendants, and no information was compiled concerning peremptory challenges by the defense or excuses for cause by the court.

Government Exhibit 1, a summary of this information that both parties agree is accurate, shows that 68.9% of the challenges actually used by the government in the cases studied were directed to black persons.[1] Additional challenges were available and not used; the government used 46% of its available challenges against black persons. Out of the 53 cases, there were 5 where the United States challenged no black persons and black persons actually served on juries.

It requires no great statistical sophistication to conclude that these data show that the government exercised its peremptory challenges in criminal cases with black defendants against blacks three times more frequently than one would expect if members of the panel were stricken at random. But, notwithstanding this, the juries actually hearing cases remained relatively representative. 657 jurors actually served; Government Exhibit 1 shows that at least 22.8% of them were black.[2] The voting age popu-

---

1. This figure is based only on challenges to members of the venire whose race was identified in the records examined. The race of ten prospective jurors—out of 216 challenged by the government—could not be determined.

2. Data on the racial composition of the juries were available for 51 of the cases studied. Government Exhibit 1 shows that 151 blacks and 36 persons whose race was unidentified served on those juries; the government's memorandum states, and no one disputes, that a total of 470 whites served on these juries.

lation of this judicial district, based on 1970 census statistics, is 26.4% black, and blacks make up approximately 21.-4% of the district's registered voters, the group from which the jury rolls are randomly drawn. It may be that the panels actually reporting for jury duty, or the panels called for duty, were over-representative of black persons, but the data submitted do not adequately explain this phenomenon.[3]

In four of the 53 cases, where the notes of the presiding judge indicated the racial identity of the entire panel, information was available concerning the race of persons who remained available on the jury panel after each side had completed its challenges. The comprehensive examination of the use of challenges possible in these cases shows:

(1) In the first case, the government, using only three of its six challenges, excused one white and two black persons. Four black persons actually served on the jury.

(2) In the second, the government used only four of its six challenges. Four black persons served on the jury.

(3) In the third, the government used no peremptory challenges, and two black persons sat on the jury.

(4) In the fourth, the government excused four white and two black persons, leaving one black person on the jury.

Had the U. S. Attorney's office been pursuing a uniform policy of excusing black jurors in all cases involving a black defendant, it could have come closer to accomplishing its purpose in these four cases by excusing black instead of white jurors, or by using its remaining challenges against black veniremen. In three of the four cases it could have obtained an all white jury; in the second case mentioned, it could have reduced the number of black jurors from four to two. In fact, in 31 of the 53 cases studied, the government failed to use all its available challenges, although some blacks remained on the jury and could have been challenged.

The United States Attorney in this district has a staff of nineteen lawyers. Of necessity, he must devote the major part of his time to administrative and supervisory responsibilities, and he is able to participate in relatively few of the actual trials. He did not personally participate in or, of course, exercise the challenges in any of the 53 cases studied. There is no hint in the evidence that he has sanctioned or encouraged any racially discriminatory policies either in the conduct of his office or in the trial of cases.

Twelve of the Assistant United States Attorneys are personally actively engaged in the trial of criminal cases; the identity of these individuals has changed in some instances during the two year period as a result of normal turnover in personnel. There is no evidence that the United States Attorney's Office adopted

---

3. Because the parties did not analyze the data available to determine either the actual racial composition of the entire jury venire or the racial identity of persons peremptorily challenged by the defense, the reason why about 22% of the jurors who served were black when the prosecution challenges were racially disproportionate cannot be determined.

One possible hypothesis is that the defense challenges in these cases were directed against white jurors. The defense has of course no duty to abide by the mandate of the Fifth Amendment, and hence might validly discriminate.

Assuming this to be so, let us examine the results. Approximately 35 jurors are called as a venire for a criminal case. If so, there were 1715 jurors (49 x 35) in the various jury venires. The U. S. was allowed 294 challenges; it used 216, and of these 142 were to persons identifiable as black.

The defense had 400 challenges available. If it used all 400 and directed them all against white persons, then 616 challenges would have been used. The fraction 142/616 would give the percentage of black persons excused: 23%. Thus, if there were a compensating imbalance in defense challenges, the rate of overall peremptory challenges to black persons was roughly proportionate to their representation on the venire. This explanation is, of course, speculative, but it does at least demonstrate that the statistical anomaly Government Exhibit 1 reveals is explainable.

any sort of policy to direct them in exercising challenges. Nor does the evidence suggest that the government cunningly avoided challenging the last possible black juror to avoid an appearance of prejudice, since in this District the parties challenge by striking names from a list without making their respective challenges known to the jury. Hence jurors have no way to know which side is excusing each juror and thus to surmise its motives.

The study of peremptory challenges presented in evidence reflects only one characteristic of the challenged persons: race. A lawyer might, and likely would, take into account other matters, such as occupation, place of residence, and answers to voir dire questions with respect to other matters. But the mathematical theory of probability demonstrates that the chance is small that so high a proportion of government challenges would have been directed to black persons if challenges were based solely on factors unrelated to race.[4] In this particular case, the probability that six government challenges not race related would have been exercised as they were is so small as to be negligible.[5] "In the problem of racial discrimination, statistics often tell

much, and Courts listen." Alabama v. United States, 5 Cir. 1962, 304 F.2d 583, 586.

## II

The data does not support the charge that the pattern followed violated the Fifth Amendment, as its requirements have been interpreted by the United States Supreme Court and the Fifth Circuit Court of Appeals.

In Swain v. Alabama, 1965, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, the Supreme Court set out the constitutional standard: "[A] State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause." The Fifth Amendment requires the same result in a federal trial. United States v. Pearson, 5 Cir. 1971, 448 F.2d 1207, Footnote 15 at 1214.

In *Swain*, the Court held that a prosecutor's challenges in a particular case, even if exercised to keep blacks off the jury, does not precipitate a constitutional claim:

"The essential nature of the peremptory challenge is that it is one exercised

---

4. Thus, for example, a challenge based on the neighborhood where the venireman resides is not based on race. But if most black persons live in certain areas, a challenge to all persons who live in such an area is based on a race-related factor.

5. As part of the hearing on the motion for a new trial, the defendant took by telephone the deposition of Dr. Terrence Ireland, an expert on statistics whose qualifications are set out in an affidavit filed in the record during earlier proceedings in this case.

Dr. Ireland's calculations have inherent limitations as evidence that the Assistant U. S. Attorney's objections made clear; the court is aware of those limitations. Dr. Ireland's results are based on a model that does not reflect fully the conditions of jury selection; he used as a variable only the race of prospective jurors; his calculations do not isolate race-correlated factors; and part of his calculations are based on a universe of only 44 cases rather than the 49 for which complete data eventually was adduced. But his calculations are instructive

nonetheless, and they do lend some support to an intuitive judgment about probabilities.

With respect to jury selection in this particular case, Dr. Ireland concluded that the probability was 0.00002568726 that the Assistant U. S. Attorney exercised his challenges without regard to race or race-correlated factors (see fn. 5). Defendant's Exhibit 11 (Motion for New Trial), received only as an offer of proof, outlines the nature of his calculations.

Dr. Ireland also calculated the probability that, in the 44 cases he had before him, the government would have challenged 71 whites (61 known white, 10 race unknown) and 132 blacks; he found it to be exceedingly small —less than 1 in 1.5 x 10 [47]. This calculation is, as the deposition testimony reflects, based on the assumption that the panel against whom these challenges were exercised was 22.53% black—an exact microcosm of the voter's list. It perhaps was not, but Dr. Ireland indicated that a variation of 3.5 percentage points in the percentage of blacks on the panel would not greatly alter his calculations.

without a reason stated, without inquiry and without being subject to the court's control. * * * "It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty. For the question a prosecutor or defense counsel must decide is not whether a juror of a particular race or nationality is in fact partial, but whether one from a different group is less likely to be."

\* \* \* \* \* \*

"With these considerations in mind, we cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws. In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, *pro tanto*, would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a great many uses of the challenge would be banned." 85 S.Ct. at 836–837.

The Court in *Swain* did suggest, however, that a case for relief would be made if the defense could show that the prosecutor "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes . . . with the result that no Negroes ever serve on petit juries. . . ." 85 S.Ct. at 837. The Court did not reach that issue because the record did not "with any acceptable degree of clarity, show when, how often, and under what circumstances the prose-

cutor alone has been responsible for striking those Negroes who have appeared on petit jury panels. . . ." 85 S.Ct. at 838.

The Fifth Circuit's disposition of United States v. Pearson, *supra*, demonstrated the stringent standard of proof that must be met before a court finds that the government's manner of exercising peremptory challenges violates the Constitution. After reviewing the pattern of challenges in trials conducted during a one week period, the court observed:

"A reasonable conclusion to be drawn is that the Government permitted Negroes to remain on the jury when the defendant was white, and challenged as many Negroes as possible (with the exception of one challenge used for the white woman lawyer) when the defendant was black. This evidence is consistent with defendants' contention that the Government's challenges were impermissibly used. We do not read *Swain* as meaning that the attack on the Government's use of its challenges must fail if the impermissible use is not exercised one hundred percent of the time (compare 380 U.S. 206, 85 S. Ct. 824, 13 L.Ed. 2d 759)." 448 F.2d at 1216–1217.

Even with this evidence, the court did not find a violation of the Constitution, because evidence dealing only with one week of trials was "entirely too slender to overcome the presumption that an official of the United States has faithfully discharged his duties in a fair, even and constitutional manner." 448 F.2d at 1218.

No defendant seems to have been able to shoulder the burden of proof imposed by *Swain* and *Pearson*, for counsel have not directed the court's attention to any case finding that a prosecutor violated the Fourteenth or the Fifth Amendment in his exercise of peremptory challenges, and the court has found none. See Note, Peremptory Challenges—Systematic Exclusion of Prospective Jurors on the Basis of Race, 39 Miss.L.J. 157

(1967); Annotation, Use of Peremptory Challenges to Exclude from Jury Persons Belonging to a Race or Class, 4 A. L.R.2d 1200. See also United States v. Corbitt, E.D.Pa.1973, 368 F.Supp. 881, and cases cited therein.

Here, however, the defendant has undertaken the comprehensive study that was evidently lacking in these prior cases; the court has before it the data necessary to judge this case under the standards outlined in *Swain's* dicta. This challenge under the Fifth Amendment and *Swain* fails for a different reason: the proof adduced is comprehensive,[6] but it is not sufficiently cogent. Both *Swain* and *Pearson* place substantial importance on a presumption that the prosecutor has acted in a manner consistent with his duties. These cases permit the defendant to overcome that presumption only by showing that blacks have been systematically excluded from juries by the government's use of its peremptory challenges.

■ The defendant here has failed to show the "systematic exclusion" of blacks prohibited by the Fifth Amendment as interpreted in *Swain* and *Pearson*. Blacks have served on juries in the Eastern District of Louisiana in only slightly less than the proportion that they register to vote, and the U. S. Attorney's office has let too many opportunities to challenge black jurors pass to permit the conclusion that the assistants use their challenges systematically to exclude blacks.

### III

While the pattern of challenges exercised by the United States Attorney over the last two years is not constitutionally infirm, all the challenges in this case were against black persons, resulting in excusing six of the seven blacks in the venire. In any other case, this might be cause merely for regret or for reitera-

tion of the *Swain* hypotheses about the capricious and speculative nature of the whole process of peremptory challenges. Against the background of this case, this result is of great concern.

At the beginning of this case, the defendant challenged the results of the jury panel selection in this District under the Jury Selection and Service Act of 1968, 28 U.S.C.A. § 1861 et seq. After the defendant had conducted a massive survey and both parties had briefed the legal issues comprehensively, the court found that the jury plan for this district had resulted in an under-representation of black persons because it relied entirely on voters lists. In 1972, 62.-74% of all eligible blacks were on the voter's lists, while 79.44% of the eligible whites were registered. On the list from which jury panels are drawn, blacks were thus under-represented by 16.7% as compared to non-blacks.

The court decided, from this examination of statistics, that the weights "are about evenly balanced" with respect to whether the under-representation was "minor" or "substantial." With the issue thus in equipoise, the court looked to the actual results of the jury selection process in this case, to determine whether the under-representation in theory had produced or would be likely to produce discrimination in fact. The court found that the jury plan, in actual operation, had not resulted in under-representation of blacks on the grand jury that indicted Mrs. McDaniels. The court found too, that under-representation of black persons on the venire from which the petit jury was to be selected would, as a matter of statistical probability, be less. It was important and persuasive that the impact of black under-representation on the racial composition of the petit jury would probably not be sufficient to result in a substantial actual under-representation. The venire drawn was representative: 7 out of 32 persons, or

---

6. The government's argument that a study covering only two years is not enough is based on the sort of reasoning that could be advanced against using any research that is

not infinite. A study of all cases for two years, with a pool of 53 cases to study, appears adequate.

21.8% were black. But as a result of the government's peremptory challenges the jury became almost as unrepresentative as it could be when chosen from this venire.

Although the Jury Selection and Service Act of 1968 deals only with the method of selecting the jury venire, and is not concerned directly or indirectly with the challenging process, it states a principle that must pervade the entire process of jury selection: "No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status."

Peremptory challenges bar jurors from service just as effectively as any other method. The prosecutor's peremptory challenges in this case must be considered against the pattern of challenges made by the government in cases involving black defendants in this district: nearly half of all possible challenges, and ⅔ of the challenges actually used, have been directed against black persons.

■ Against this background, and in these unusual circumstances, this court's responsibility under Rule 33 of the Federal Rules of Criminal Procedure may require more than its duty under the Constitution. While the power to grant a new trial accorded by Rule 33 should be exercised with caution and only in exceptional cases, United States v. Costello, 2d Cir. 1958, 255 F.2d 876; see also Orfield, Criminal Procedure Under the Federal Rules § 3381, the rule recognizes that there are instances where the judge should grant a new trial to a defendant already convicted. It does not attempt to set forth a catalog of injustices. Its broad mandate is designed to buttress the judicial process by allowing a judge to grant a new trial on motion of the defendant when a new trial is required "in the interest of justice". The judge does not free the accused; he requires only a trial that will achieve the true end of legal process, justice under law.

Rule 33 does not attempt to define the interest of justice, nor could it. Philosophers and jurists have sought parameters by which to measure justice for millenia. The prophet Amos pondered the meaning of justice 2200 years ago and the philosopher Plato debated it four centuries later. Both of them built upon the wisdom of prior ages. The speculations and insights of those who have since tried to define the nature of justice literally fill volumes.

While "justice is the first virtue of social institutions, as truth is of systems of thought," Rawls, A Theory of Justice 3, 1971, it is not a virtue that lends itself either to precise analysis or juridical definition. Edmund Cahn, a lawyer and law teacher, thought that justice could best be defined by reflecting on what actions so violated principles of equity and morality that they provoked a "sense of injustice". Cahn, The Sense of Injustice, 1949.

However elusive the concept may be, there is a universal human feeling, not confined to philosophers, lawyers, or judges, that there is a quality known as justice, and that it is the aim of legal institutions to achieve it. The Constitution invokes that sense and sentiment in its first purposive phrase: it is ordained "to establish justice". Madison, writing in Federalist No. 51, called it "the end of civil society. It ever has been and ever will be pursued until it be obtained, or until liberty be lost in the pursuit." This feeling that justice is a supreme goal, this sense that it is a predicate to organized society, is no mere yearning, for it is only in a fair proceeding, one that comports with our sense of justice, that we can with any legitimacy call another human being to account.

Justice must not only be done; it must be seen to be done. The interest of justice requires more than a proceeding that reaches an objectively accurate result; trial by ordeal might by sheer chance accomplish that. It requires a proceeding that, by its obvious fairness, helps to justify itself.

■ Counsel who are listed above did not conduct the trial. There was a duty on the Assistant U. S. Attorney who did prosecute it, under the circumstances here present, to exercise at least reasonable care not to dilute further the representative quality of the jury. This duty was not born of *Swain's* constitutional prohibition, nor any explicit duty the law imposes on a prosecutor; it arose out of the matrix of facts in this case. There can be no reflection on his personal character, no issue of his lack of racial animus, nor any argument that he violated the law. But his failure to exercise challenges in such a manner as not to render the jury in this case unrepresentative resulted in a trial process that was so unfair as to impel the court to grant a new trial under Rule 33 of the Federal Rules of Criminal Procedure, in the interest of justice. This conclusion, we emphasize, is not based alone on the challenge of six black jurors, nor is it a suggestion that the challenge hitherto denominated peremptory should be defined as quasi-peremptory. It is based on the conviction that the use of the challenges here—against the background of this particular case and in light of the statistical evidence—resulted in a trial that was less than fair.

For pragmatists, this decision will seem not only to restrict the use of peremptory challenges, but to do so with a standard so ambiguous as to create a chimerical potential defect in every trial. They will ask, "What would happen if only five, rather than all six, of the government's challenges were used in a certain way?"

Such questions may properly be put. But the posing of borderline hypotheses should not prevent actual relief when the case is clear. It is not the task of this opinion, any more than it was the duty of those who promulgated and adopted Rule 33, to construct a micrometer to measure justice. Other courts, weighing other uses of the peremptory challenge, must interpret the Rule's mandate in light of circumstance and their view of its requirements. It suf-

fices here to say that this court views the power given by Rule 33 as one to be exercised sparingly, and only when the court is left with the profound conviction that, while all known specific rules were obeyed, the trial itself was nonetheless unjust. It is with this conviction, and with the belief that the interest of justice will be served by so doing, that the motion for a new trial is granted.