557 F.2d 1064
 UNITED STATES of America, Plaintiff-Appellee,
v.
Irby McLAURIN, a/k/a "Pop", "Jesse Earl Jackson", and
"Lonnie", and Marilyn Williams, a/k/a "Tator
Britches", Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Herbert Lee CHRISTOPHER, Leon "Boe" Christopher, Herbert Lee
Bryant, Willie Lee "Henry Lee Bell" Parker, Gerald Alexander
"Sweetback" Christie, Eddie Lee Wright, Mable Horne, Dorothy
Mae "Zip" Hamilton, Patricia Ann "Pat" Williams, Marsha
Davis, Nelson James Franklin, and John Christopher, Jr.,
Defendants- Appellants.
 Nos. 75-3364, 75-3387.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 15, 1977.
Rehearing and Rehearing En Banc Denied Oct. 11, 1977.
 
 Lynwood F. Arnold, Jr., (Court-appointed), Tampa, Fla., for Williams.
 Irby McLaurin, pro se.
 William A. Patterson, (Court-appointed), St. Petersburg, Fla., for Irby McLaurin.
 Martin N. Strelser, (Court-appointed), Tampa, Fla., for Herbert Lee Christopher.
 Charles J. O'Connor, (Court-appointed), Tampa, Fla., for Leon Christopher.
 John J. Chamblee, Jr., (Court-appointed), Tampa, Fla., for Herbert Lee Bryant.
 Elvin L. Martinez, (Court-appointed), Tampa, Fla., for Willie Lee Parker.
 James V. Caltagirone, (Court-appointed), Tampa, Fla., for Gerald Christie.
 Edgar C. Watkins, Jr., (Court-appointed), Tampa, Fla., for Eddie Lee Wright and Nelson James Franklin.
 Harley E. Riedel, II, (Court-appointed), Tampa, Fla., for Mable Horne.
 Dennis G. Diecidue, (Court-appointed), Tampa, Fla., for May Hamilton.
 Allan C. Watkins, (Court-appointed), Tampa, Fla., for P. A. Williams and Marsha Davis.
 John L. Briggs, U. S. Atty., Jacksonville, Fla., Alan J. Sobol, Sidney M. Glazer, Atty., S. Michael Levin, Special Asst. U. S. Atty., Strike Force Dept. of Justice, Washington, D. C., L. Eades Hogue, Tampa, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Middle District of Florida, Tampa Division.
 Before JONES, COLEMAN and TJOFLAT, Circuit Judges.
 TJOFLAT, Circuit Judge:
 
 
 1
 This appeal comes to us following a five-week trial in Tampa, Florida, during the summer of 1975. When the dust had settled, fifteen defendants found themselves convicted of various federal offenses as a result of their participation in an apparently lucrative commercial enterprise specializing in prostitution.[1] From this conviction, fourteen of the defendants have appealed, alleging various substantive and procedural defects in their convictions. We affirm.
 
 I. THE FACTS
 
 2
 Before considering the various assignments of error raised by the appellants, we should make a detailed statement of the facts of this case. Since most of the appellants have questioned the sufficiency of the evidence, a thorough review of the facts developed at trial is necessary at this juncture in order to avoid repetition when we reach the sufficiency issue.
 
 
 3
 Viewed in the light most favorable to the verdict below,[2] then, the facts are these. The government's case-in-chief hinged primarily upon the testimony of six women: Linda Marie Davis, Jeanette LaFreta Hill, Joan Jennifer Hoff, Barbara Scott Vann, Mary Alice Howard and Constance G. Perez. All six of these women had, at one time or another, participated in the prostitution activity underlying the indictment. The government also called a multitude of witnesses who corroborated largely through circumstantial testimony various portions of the stories pieced together by the six female eyewitnesses. This corroborative evidence included the testimony of twelve FBI agents, six motel managers, the manager of an apartment complex in Tampa, and at least ten other assorted witnesses.
 
 
 4
 As the government's case progressed, a picture of the organization of the prostitution activity developed. It appeared that the most active leadership role was played by the defendant John Christopher, Jr. His "second in command" was his brother and co-defendant Herbert Christopher, who was assisted in his lieutenant's role by a third brother, Leon Christopher (also a co-defendant). A lower tier of management personnel included the male defendants Franklin, Byrant, Parker, Christie, Marilyn Williams, Wright, and McLaurin. Assisting them as a collector and courier of cash received by the prostitutes was the female defendant Mable Horne. The roles of the remaining female defendants (Mary Lee Mincey, Dorothy Mae Hamilton, Marsha Davis, and Patricia Ann Williams) were apparently limited to the actual performance of prostitution activity.
 
 
 5
 Chronologically, the government's case began with certain events which transpired in the summer of 1970, as testified to by Linda Marie Davis. Davis related that in June of that year, in a Virginia suburb of Washington, D.C., she had seen John Christopher, Jr., accompanied by the defendant Marsha Davis and another woman. Christopher asked Linda Davis if she would like to drive with them to Florida to see John's brother Leon Christopher, whom she knew. Davis joined them, but rather than taking the group south as promised, John Christopher drove north, stopping at various points in northern Virginia, Maryland, and Delaware for the apparent purpose of procuring income from prostitution. Christopher pressured Linda Davis to join the other two women in their prostitution activities, and she eventually agreed. She testified that her participation was not voluntary, but motivated by her fear of physical harm at the hands of John Christopher. Eventually Christopher stopped at a gas station in Delaware, where a police officer approached the car, checked its registration, and questioned its occupants. Davis testified that during this episode she managed to escape from the group.
 
 
 6
 From this point, the government's case moved ahead three years to August 1973. Jeanette LaFreta Hill testified that on the evening of August 17, while she was walking to her home in Tampa, Florida, she encountered the defendants Herbert Lee Bryant and Herbert Lee Christopher. They were in an automobile with two other persons. At gunpoint, Bryant asked Hill to get in the car; when she refused, he got out of the car and struck her on the back of the head. According to her testimony, she then blacked out and awoke as the car was arriving at the Lindale Motel in Tampa. At the motel she was introduced to John Christopher, Jr. Eventually Bryant and John Christopher left the Lindale in a car with Hill as their passenger. After they had picked up another passenger, the defendant Dorothy Hamilton, they drove to a Ramada Inn where Bryant registered using John Christopher's identification. Hill testified that while they were at the inn, Byrant asked her to work for him as a prostitute. When she declined the offer, Bryant struck her and forced her to have sexual intercourse with him. The four Bryant, Hill, John Christopher and Dorothy Hamilton remained at the inn throughout the night.
 
 
 7
 The next day, Bryant bought Hill some "working clothes", anticipating her eventual employment as a prostitute. John Christopher provided the money for this transaction. On that evening and the next, Hill was taken to two Tampa bars and encouraged to solicit for prostitution. By her testimony, she refused to do so, but she did not attempt to escape because she feared further physical reprisals from Bryant.
 
 
 8
 The next day was August 20. According to Hill, Bryant took her to a street corner in Tampa and instructed her to solicit for prostitution by pretending to hitchhike. Hill did as Bryant had told her, but when a car stopped to pick her up, she merely asked the driver to take her home. Before the car could pull away, however, Bryant got Hill out of the car and took her back to the Lindale Motel. At the motel, Hill testified, Bryant "slapped (her) a couple of times" and told her to do as he instructed. Later that day, Bryant brought a man to Hill's room and "made (her) have sex with the guy." In the evening, Hill was taken to two bars in Tampa, but did not transact any business.
 
 
 9
 In the evening of the following day, Hill was driven to a Tampa establishment called the Gator Bar, where she again saw Bryant. He gave her a quota for the evening's prostitution business, but rather than attempting to fill her quota, Hill ducked out of a side door and ran for several blocks. Eventually a man offered to take her home, and she accepted. When Hill got home, her mother called the police. Before the police arrived, the defendant Dorothy Mae Hamilton came to the door and told Hill that Bryant wanted to speak with her. Hill refused. Dorothy Mae Hamilton then left, but the car in which she was a passenger remained parked in front of the house until the police arrived some twenty minutes later.
 
 
 10
 Hill had no further contact with any of the defendants except for one incident which occurred almost a year after the events just described. In the summer of 1974, Hill testified, she saw the defendant Bryant in a Tampa bar. In this encounter, Bryant threatened to kill her if she persisted in involving the police. Hill then left the bar and did not see or hear from Byrant or any other defendants until she testified at their trial.
 
 
 11
 The next government witness was Barbara Scott Vann. Vann testified to meeting Herbert Bryant in Tampa during February 1974. She described an incident which transpired about two weeks after she had first met Bryant and which led to her involuntary commission of acts of prostitution at Bryant's direction. According to Vann, Bryant offered her a ride home from a Tampa laundromat and, when she accepted, drove her instead to a bar called Carmella's, located in the Tampa suburb of Gordonville. At Carmella's, Vann related, Bryant ordered her to "make him some money" by offering herself for prostitution. Carmella's was apparently well suited to this purpose, since it was adjacent to several mobile homes and trailers which afforded a convenient location for prostitutes to execute the contracts they had made inside the bar. Van eventually acceded to Bryant's demands and grossed about ninety dollars that evening. At about 2:30 in the morning, Vann and several others, including Bryant, left Carmella's and returned to Tampa. Vann spent the remainder of the night in Bryant's apartment with six other people. She slept on the sofa, and did not try to escape because a man was "watching" her for Bryant.
 
 
 12
 The next day, Bryant took Vann to a Tampa shopping mall and bought her some hot pants, a halter top, and shoes. Later that day, Bryant took Vann to a pool room on Twenty-second Street in Tampa, where she met the defendant John Christopher, Jr. Bryant and John Christopher had a conversation which Vann did not overhear. Bryant took her back to Carmella's bar. Once there, Vann was able to escape, thus ending her contact with any of the defendants.
 
 
 13
 In addition to implicating the defendants Bryant and John Christopher, Vann made in-court identifications of two other defendants. These were Nelson James Franklin and a second defendant known to Vann only as "Sweetback." The evidence subsequently revealed that "Sweetback" was a nickname used by the defendant Gerald Alexander Christie.
 
 
 14
 The next body of evidence in the government's case centered on prostitution activity in the Tampa-Gordonville area between October 1973 and June 1974. The two chief witnesses were Constance Perez and Joan Jennifer Hoff. Perez testified that in October 1973 she approached the defendant Nelson Franklin and told him that she wanted to go to work for John Christopher, Jr. Perez had worked the Tampa area as a prostitute before, and told Franklin that Christopher's entourage was noticeably well-dressed and rode in nice automobiles. An agreement was reached, and Perez moved into the Colonial Oaks Apartments in Tampa.[3] A few months later, Perez was joined there by Joan Jennifer Hoff, who testified that she was "best friends" with Perez and wanted to be near her. Although Hoff had not engaged in prostitution before, the defendants Herbert Christopher and Mable Horne gave her instructions on how the business worked.
 
 
 15
 Between them, Perez and Hoff constructed a picture of the prostitution ring that was very damaging to the defense. From October 1973 to June 1974 the Christopher prostitutes generally worked Tampa during the week and Gordonville on the weekends. The group's clientele ranged from migrant workers in Gordonville, who were generally charged $10 per "trick", to the more uptown crowd of Tampa's "strip" area, where the market rate was usually $50 per trick. Additionally, the girls would work various bars and shipyards in Tampa at $15-$20 per contract. Each night, the girls would turn over all their earnings to either John Christopher or Herbert Christopher.[4]
 
 
 16
 Frequently during this period the girls would operate out of a pool room-record store-clothing store complex in Tampa owned by John Christopher and his wife. Occasionally the girls would base their operation at John Christopher's house or Herbert Christopher's apartment. In addition to the two Christophers, there were eight other male defendants who performed various supervisory duties at this time.[5]
 
 
 17
 In early July 1974, a large group of defendants went to Cordele, Georgia. Some returned to Tampa later that month, while the others returned by early August. Although the indictment alleged that the Cordele excursion had been for the purpose of conducting the prostitution business in and around south Georgia truck stops, the government was unable to prove exactly what went on in Cordele. Consequently, at the close of the government's case in chief, the trial judge appropriately directed a verdict of acquittal as to all defendants regarding those portions of the indictment charging illegal activity in Cordele.[6]
 
 
 18
 Shortly after the group returned from Cordele, Bryant's recruitment efforts produced another government witness-to-be, Mary Alice Howard. Bryant and the defendant Marilyn Williams met Howard through a friend of Howard's named Janice Douglas. Howard later met the Christopher brothers in John Christopher's pool room, and still later came to know most of the other defendants in some capacity. At the trial, Howard was able to identify in court all the defendants except Mable Horne.
 
 
 19
 When Howard first met John Christopher, in early August 1974, Christopher had decided to take the show on the road. He was organizing a group excursion to Pennsylvania, where the migrant workers had moved to work the harvest season. Perhaps feeling the absence of the high-volume, low-overhead business that the migrant workers generated, John Christopher determined to follow them and set up shop near their camps.
 
 
 20
 Initially, Howard was told that the group was going to Pennsylvania for a party. On the night before the departure, however, the defendant Marilyn Williams told her the real purpose of the trip, and that she was expected to accompany the group and participate in the business. Howard had never before worked as a prostitute and balked at the idea. After Howard had expressed her unwillingness to participate, Marilyn Williams bound her hands and feet with clothes hangers, and Howard spent the night in that condition.
 
 
 21
 The next morning, Howard was untied and told John Christopher that she did not want to make the trip to Pennsylvania. John Christopher told her that that was between her and Marilyn Williams. Williams apparently prevailed, since Howard did end up traveling with the group. She testified that she did so involuntarily, afraid to escape because she feared physical harm at the hands of Marilyn Williams.
 
 
 22
 The first group to travel to Pennsylvania consisted of, in addition to Ms. Howard, the defendants Marilyn Williams, John Christopher, Franklin, Bryant, and Parker, and several other individuals who were not defendants in this case. The group established Gettysburg as its base of operations. From here, they worked various rest areas and a recreation area for migrant workers. Howard was coerced to prostitute after receiving her basic instructions from Williams. She testified that she participated against her will, that Williams beat her for not making enough money, and that she was constantly watched by either Williams, Franklin, or Parker.
 
 
 23
 A few weeks after the first group had arrived in Pennsylvania, John Christopher called his brother Herbert (who had remained behind in Tampa) and told him to send several of the male defendants north to help supervise the operation. In late August, the defendants Herbert and Leon Christopher, Wright, McLaurin and Christie, together with several women including J.J. Hoff and the defendants Mincey, Hamilton, Davis, and Patricia Williams, traveled to Pennsylvania as John Christopher had requested. In fact, the only defendant who did not make the Pennsylvania trip was Mable Horne.
 
 
 24
 The group stayed in Gettysburg for a number of weeks specifically, until early October 1974. During this excursion, the overall operation was directed by the Christopher brothers, while the remaining male defendants performed day-to-day (or perhaps more accurately, night-to-night) supervisory duties.[7] In early September, government witness Mary Alice Howard was beaten by Marilyn Williams, and soon thereafter attempted to escape with witness J.J. Hoff and another woman named Shirley. The escape failed, and the women were beaten Howard by Marilyn Williams, and Hoff by Herbert Christopher. John Christopher subsequently ordered the beatings stopped and gave Howard her plane fare back to Tampa in exchange for her promise not to go to the police.
 
 
 25
 Some days after this incident, Herbert Christopher left Gettysburg on what was to be a brief return trip to Florida. J.J. Hoff accompanied him on this trip, mainly because (she testified) John Christopher did not want her to remain in Pennsylvania without Herbert to supervise her. After Hoff and Herbert Christopher had stayed in Florida for several days, Herbert informed Hoff that it was time for them to return to Pennsylvania. On the return trip, Herbert stopped at a truck stop in Haines City, Florida, and asked Hoff to attempt to generate some income among the truckers for the return trip. Hoff agreed, and Herbert went into the restaurant to eat. Hoff circulated among the truckers, but rather than seeking work she looked for someone who would take her back to Tampa. Eventually she found a trucker who agreed to give her a ride, and she returned to Tampa. On September 13, 1974, Hoff gave a statement to the FBI. Herbert Christopher had by this time returned to Tampa and was apparently trying to contact her. On September 17, 1974, Hoff allowed the FBI to tape a phone conversation with Herbert Christopher, during which Christopher made several statements which corroborated her testimony about Christopher's involvement in the enterprise and the beatings which Hoff had sustained.
 
 
 26
 On September 21, 1974, Herbert Christopher saw Hoff at a Tampa bar. He threatened her and ordered her into his car, stating that she was going to Pennsylvania whether she wanted to or not. He then took Hoff and four others back to Pennsylvania, where they rejoined the group. In the meantime, Hoff's sister had notified the FBI of the apparent abduction. On October 6, 1974, the FBI located Hoff in Pennsylvania and brought her to Tampa. On October 22, Hoff testified before a federal grand jury concerning the Christophers' operation, and she was then placed in protective custody.
 
 
 27
 The facts that we have thus far recounted derive primarily from the testimony of the six female witnesses who gave "insider" accounts of the prostitution ring. In addition the government called twenty-nine other witnesses, who corroborated the testimony of the six women circumstantially through such items as motel receipts, bank drafts, and photographs.[8]
 
 
 28
 The defense case was not voluminous. None of the defendants testified, and only five offered any evidence. Most of this evidence was offered in what appear to have been variations on the alibi theme. For example, John Christopher offered evidence to show that his trip to Pennsylvania had been for the purpose of visiting in-laws; Nelson Franklin offered evidence to show that he was working as a migrant worker rather than in the prostitution business; and Mable Horne presented evidence that she attended nightly church revival meetings in the summer of 1974. Additionally, Herbert Bryant offered evidence to impeach the testimony of government witnesses Barbara Scott Vann and Jeanette LaFreta Hill.
 
 
 29
 After closing arguments and instructions from the court, the jury retired to commence its deliberations late in the afternoon of Saturday, July 12, 1975. The jury convened for a while that day and all of the next two days, finally reaching a verdict in the afternoon of Tuesday, July 15, the fourth day of its deliberations. Unanimous verdicts were returned as to all the remaining counts and defendants. The final result then, as to each count of the indictment was as follows:
 
 
 30
 Count I: Conspiracy to conduct Guilty as to all defendants.
a pattern of racketeering
in violation of 18 U.S.C. Secs. 1961,
1962(d).
Count II: Association with an Guilty as to defendants
interstate enterprise conducting John Christopher, Jr.,
its affairs through a pattern of Herbert Christopher,
racketeering, in violation of 18 and Bryant.--Not Guilty
U.S.C. Sec. 1962(c). as to defendants
 Franklin, Marilyn Williams,
 and McLaurin.--
 Directed verdict of acquittal
 as to remaining
 defendants.
Count III: Interstate travel, Directed verdict of acquittal
viz. from Tampa, Florida, to Cordele, as to all defendants.
Georgia, in aid of a business
enterprise involving prostitution,
in violation of 18 U.S.C. Sec. 1952
(a)(3).
Count IV: Interstate travel, viz. Directed verdict of acquittal
from Cordele, Georgia, to Tampa, as to all defendants.
Florida, in aid of a business
enterprise involving prostitution, in
violation of 18 U.S.C. Sec. 1952(a)
(3).
Count V: Interstate travel, viz. Guilty as to all named
from Florida to Pennsylvania, defendants.[9]
in aid of a business enterprise
involving prostitution, in
violation of 18 U.S. C. Sec. 1952(a)(3).
 
 
 31
 The district court imposed sentences ranging from ten years' confinement (for John Christopher, Jr.) down to probation. All the defendants at trial were sentenced to serve some time in prison with the exception of Mary Lee Mincey, who was the only defendant below who has elected not to appeal her conviction.
 
 II. THE ISSUES
 
 32
 All fourteen appellants have joined in a consolidated brief arguing five common issues: (1) whether the prostitution ring alleged in the indictment is an "enterprise" within the meaning of 18 U.S.C. § 1961(4); (2) whether the trial court erred in refusing to grant the various defendants' motions for severance; (3) whether one prospective juror's responses during voir dire examination so tainted the proceedings that the entire venire should have been stricken; (4) whether the trial court erred in refusing to strike the entire jury panel following the alleged "discriminatory" use of peremptory challenges by the government; and (5) whether the trial court properly refused to grant a new trial. In addition to this consolidated brief, several defendants have filed individual briefs asserting (1) more particularized arguments on the severance issue and (2) the sufficiency of the evidence to support their own convictions. In her individual brief, the defendant Mable Horne further argues that the government's reference during closing argument to a portion of the testimony that the court had stricken was reversibly prejudicial as to her.
 
 
 33
 We shall first discuss the issues jointly asserted by all the defendants. We will then turn to the arguments raised in the various individual briefs before us.
 
 A. The Common Issues
 
 34
 First, the appellants argue that the indictment failed to state an offense against the United States because the prostitution ring alleged therein was not an "enterprise" within the meaning of 18 U.S.C. § 1961(4) (1970). That statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Id. Since all of the substantive crimes charged in the indictment are predicated on the existence of an enterprise as defined by section 1961(4), the prostitution activities alleged must come within the statutory definition of an enterprise in order for the indictment to stand.
 
 
 35
 Section 1961(4) was enacted in 1970 as part of a broad piece of legislation styled the Organized Crime Control Act of 1970 (the Act). Since that time, there has been a considerable amount of litigation over what constitutes an enterprise in the context of that statute. Generally, two irreconcilable positions have emerged. One position holds that the Congress intended for the Act to reach only legitimate business enterprises which become infiltrated by organized crime and then operate as "fronts" for organized criminal interests. See United States v. Moeller, 402 F.Supp. 49 (D.Conn.1975); United States v. Amato, 367 F.Supp. 547 (S.D.N.Y.1973); see also United States v. Altese, 542 F.2d 104, 107 (2d Cir. 1976) (Van Graafeiland, J., dissenting), cert. denied, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); cf. United States v. Mandel, 415 F.Supp. 997 (D.Md.1976). Our canvassing of the cases indicates that this position can be fairly characterized as a minority view. The contrary and more prevalent position holds that Congress intended for the Act to encompass not only legitimate businesses but also enterprises which are from their inception organized for illicit purposes. See, e. g., United States v. Altese, 542 F.2d 104 (2d Cir. 1976), cert. denied, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); United States v. Cappetto, 502 F.2d 1351 (7th Cir. 1974), cert. denied, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975).
 
 
 36
 This latter position is unquestionably the law of this circuit. See United States v. Morris, 532 F.2d 436 (5th Cir. 1976); United States v. Hawes, 529 F.2d 472 (5th Cir. 1976); cf. United States v. Brown, 555 F.2d 407 (5th Cir. 1977). The appellants suggest, however, that the validity of this court's construction of "enterprise," as reflected in the Morris, Hawes, and Brown opinions, is questionable in light of certain language in the Supreme Court's opinion in Iannelli v. United States, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). In footnote nineteen of that opinion, Mr. Justice Powell, speaking for the Court, stated that "Title IX (of the Act), codified in 18 U.S.C. §§ 1961-1968, seeks to prevent the infiltration of legitimate business operations affecting interstate commerce by individuals who have obtained investment capital from a pattern of racketeering activity. (See) § 1962. . . ." Although we quite agree with that statement, we see no indication that it was intended to describe fully, or to limit, the ambit of the Act's coverage. The appellants would have us read the footnote in question in a manner reminiscent of the principle of statutory construction expressio unius est exclusio alterius, adopting the view that the Court has by negative implication excluded thoroughly illicit businesses from the Act's proscriptions. This we decline to do absent a clearer and fuller directive from the Court. Additionally, we would note that Morris, Hawes and Brown all postdate the Iannelli decision, so that this court's rule against overruling prior panel decisions except through the court en banc bars us from accepting the appellants' view. We hold, then, that the organized prostitution activity alleged in the instant indictment falls within the definition of "enterprise" prescribed in 18 U.S.C. § 1961(4), and accordingly find the appellants' first contention to be without merit.
 
 
 37
 The appellants next argue that the trial court improperly denied their motions for severance.[10] They urge that the crowded courtroom conditions[11], the racial identity of the defendants (all were black), and the plethora of nicknames[12] among the defendants as well as the similarity of given names[13] made it impossible for the appellants to receive a fair trial collectively. While we agree that the joint trial of all these appellants was less than an ideal situation, we are compelled to reject the argument that the joinder of these defendants in itself created reversible error as to the trial as a whole. On the contrary, the record discloses that the trial judge made admirable and exhaustive efforts to ensure that each defendant was tried on the merits of his or her own case, and that is, of course, the end to be achieved in any joint trial. See Tillman v. United States, 406 F.2d 930, 935 (5th Cir.) vacated in part, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). We shall briefly discuss the reasons underlying this conclusion.
 
 
 38
 The appellants first ask us, perhaps somewhat optimistically, to condemn the notion of any joint trial as a denial of due process per se. They point to the general and well-known problems attendant to large trials with multiple defendants: the danger of jury confusion; the practical inadequacy of limiting instructions to prevent such confusion; and, by natural progression, the substantial risk of defendants finding themselves convicted not upon their own acts but upon an unwarranted stigma of guilt imputed to them because of the acts of a co-defendant. We concede that joint trials, and especially those involving many defendants, carry substantial risks of manifest unfairness. At the same time, it is beyond question that such trials are now an accepted and even necessary aspect of our judicial system. This is because our system will tolerate the risk of unfairness so long as careful efforts are made to ensure that the inequities are kept in check. In this connection, the major burden falls upon the shoulders of the trial judge, since it is he who must be constantly aware of the possibilities of jury confusion and guilt by implication and continually vigorous in his efforts to forestall those effects. Our judicial system recognizes that this is a difficult but attainable goal. Since we, too, are convinced that multi-defendant trials are consonant with the ends of justice if properly conducted, we cannot accept the appellants' contention that all such trials are by their very nature unconstitutional.
 
 
 39
 Perhaps anticipating this court's reluctance to condemn all multi-defendant criminal trials, the appellants fall back on Rule 14, Fed.R.Crim.P., which provides in pertinent part that
 
 
 40
 (i)f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 
 
 41
 Thus, Rule 14 speaks to the issue of prejudicial joinder, and is couched in terms which require a trial court to weigh the prejudice attendant to a joint trial against interests of judicial economy and to sever defendants or charges as the needs of justice dictate. Of necessity, this balancing process is committed in the first instance to the sound discretion of the trial judge, and an appellate court will not substitute its own judgment for that of the lower court absent an affirmative showing that the lower court has abused its discretion. See, e. g., Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); United States v. Morrow, 537 F.2d 120 (5th Cir. 1976); United States v. Crockett, 514 F.2d 64 (5th Cir. 1975).[14] This court has upon occasion characterized the defendant's burden of showing prejudice as a "heavy"[15] or "extremely difficult"[16] burden, and the general test has been stated as
 
 
 42
 * * * whether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.
 
 
 43
 Tillman v. United States, 406 F.2d 930, 935 (5th Cir.), vacated in part 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).
 
 
 44
 In light of this test, we find no abuse of discretion in the trial court's refusal to allow the appellants to be tried separately. The indictment itself alleged a pattern of concerted activity both in the conspiracy allegations (Count I) and the related substantive "enterprise" allegations (Counts II-V). Under those circumstances, it was quite reasonable to expect that considerable time and expense would be saved if the defendants were tried jointly. Additionally, the record indicates that the trial court took great pains to avoid potential juror confusion by requiring the witnesses clearly to identify particular defendants when nicknames were used for reference or when a name common to two or more defendants emerged in the testimony. And, of course, the trial court promptly gave the Apollo instruction[17] when requested to do so in order to lessen the likelihood of individualized prejudice. Under these circumstances, the appellants' argument that it was an abuse of discretion for the trial court to allow them to stand trial en masse must fail.
 
 
 45
 The remaining issues asserted in the appellants' joint brief can be handled without protracted discussion. During the voir dire examination of jury veniremen, one prospective juror was asked whether he had seen any of the defendants before and responded by saying that he had once seen the defendant Parker at a truck stop in Cordele, Georgia. At the time, Counts III and IV of the indictment alleged that Parker and the other defendants had operated their prostitution enterprise in Cordele during the summer of 1974. From this set of circumstances, the appellants argue that the trial court should have granted a defense motion to strike the entire venire, urging that the panel as a whole had become "tainted" as a result of the prospective juror's allegedly prejudicial answer.
 
 
 46
 This argument is meritless. The prospective juror in question was, of course, dismissed for cause. The court later determined through questioning him that he had related nothing of the experience to his fellow veniremen apart from the single statement on voir dire which we have related. And as we have already recounted, the district judge later directed a verdict of acquittal as to all charges in the indictment involving prostitution activities in Cordele. As a result, whatever prejudice existed, if any, was substantially purged when the court removed the Cordele-related allegations from the province of the jury. In sum, the district court's refusal to strike the entire venire was, under these circumstances, no error.
 
 
 47
 The appellants raise their last two joint assignments of error in connection with the same factual setting. They argue that during the process of selecting a jury to try this case, the government exercised its peremptory challenges in a racially discriminatory manner, the net effect of which was to deny the appellants their right to be tried by a jury which is representative of their community.[18] The appellants contend that in light of the government's conduct the trial court erred on two separate occasions: first, when the court denied a defense motion to strike the entire jury when it was originally empanelled; and, second, when the court denied post-trial defense motions for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. We do not agree with either of these contentions.
 
 
 48
 The appellants' argument that the court should have stricken the entire jury is a constitutional one. In Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Court acknowledged that constitutional rights may be infringed by a state's deliberate and continued exclusion of blacks from a jury through the use of peremptory challenges. The Swain Court also acknowledged, however, that a defendant bears a heavy burden when he seeks to show systematic discrimination of constitutionally significant proportions, and that in any event he must rest his contentions on a factual base which is broader than that presented by his own case alone. Id. at 222, 85 S.Ct. at 837 (". . . we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case."). Although Swain of course involved state rather than federal proceedings, we apply the same standards and analysis in our review of federal criminal trials. United States v. Pearson, 448 F.2d 1207 (5th Cir. 1971). In this case, the appellants presented no evidence of any continued and systematic exclusion of blacks from petit juries through the government's use of peremptory challenges. Under Swain, the record in a single case, standing alone, simply cannot implicate constitutional rights in this context.
 
 
 49
 The appellants also contend that the district court should have granted a new trial upon timely defense motion pursuant to Rule 33, Fed.R.Crim.P. That rule allows a trial court the broad discretion to grant a new trial "if required in the interest of justice." The trial court's denial of a Rule 33 motion, however, is subject to appellate reversal only in cases where the appellant can demonstrate a clear abuse of discretion. See, e. g., United States v. Gatto, 533 F.2d 264 (5th Cir. 1976); United States v. Jacquillon, 469 F.2d 380 (5th Cir. 1972), cert. denied, 410 U.S. 938, 93 S.Ct. 1400, 35 L.Ed.2d 604 (1973). In this case, we can see no abuse of discretion in the trial court's denial of the motion for a new trial. The appellants not only failed to present any evidence of continuing and systematic exclusion of blacks because of their race, but also failed to demonstrate or even offer to demonstrate that the government had excluded the potential jurors in question for racial reasons. Absent such a showing, the district court's denial of the appellants' Rule 33 motion was squarely within its range of discretion.[19]
 
 B. The Individual Assignments of Error
 
 50
 In the preceding subpart we determined that none of the issues raised by the appellants in their joint brief warranted reversing their convictions. We now turn to particularized arguments raised by the appellants in their individual briefs.
 
 
 51
 First, the appellant Mable Horne argues that the district court abused its discretion in denying her motion for a mistrial made during the government's closing argument. The basis for Horne's motion was the government's allusion to a portion of the testimony against Horne which the district court had previously ordered stricken from the record. The testimony in question came from the FBI agent who arrested Horne. The agent testified that Horne had $900 in cash in her possession at the time of her arrest. Further examination revealed, however, that the agent's testimony was based on hearsay, since he himself had not been present when the cash was discovered. Based upon this revelation, the district court ordered the testimony stricken from the record.
 
 
 52
 No one questions the fact that the government attorney alluded to the $900 in cash during the course of his closing argument. Considering the length of the government's closing argument and the massive body of evidence to be covered, the allusion was probably inadvertent, but it was nevertheless improper. After the prosecutor made the improper reference, however, an objection was made and the jury was promptly instructed to disregard the argument. Under these circumstances, we must examine the entire case against Horne in order to determine whether this concededly erroneous incident might have been harmless beyond a reasonable doubt.
 
 
 53
 We have done so, and we hold that the error was harmless. Horne was convicted only on Count I of the indictment, the conspiracy count.[20] As to that count, the government adduced a substantial amount of evidence tending to show her active involvement in the conspiracy. As we recounted in Part I supra, there was direct testimony that she had on several occasions acted as a money collector for John Christopher, Jr., and that she had helped to instruct newly-recruited prostitutes-to-be on the finer points of the profession. In light of the substantial evidence against Horne independent of the stricken evidence, we have no doubt that the government's improper mention of the excluded evidence constituted harmless error.
 
 
 54
 The remaining individual arguments all assert that the evidence below was insufficient to support the conviction of various appellants.[21] We have studied the record in this case thoroughly, and have determined that none of these assertions have merit. In all cases, we feel that the government successfully made a legitimate jury issue as to all matters that the district court allowed to be submitted to the jury. In fact, we have found only a few items which require any discussion on our part.
 
 
 55
 Several of the appellants challenge the sufficiency of the evidence by arguing that the most the government was able to demonstrate was that they were in some sense associated with other defendants who were themselves engaged in criminal activity. Thus, it is argued, the government failed to prove that these particular appellants were willful participators in the prostitution enterprise, and as a consequence an essential element of the offenses charged viz. specific intent was lacking as a matter of law. We do not agree with this argument as it relates to any of these appellants. It is true that the evidence adduced at trial demonstrated a wide range in the level of active involvement with which many of these appellants engaged in illegal activity. The record also indicates, however, that a jury could reasonably exclude the hypothesis that any of these appellants participated in the enterprise against his or her will. As to the male appellants, each of them was shown to have performed, at one time or another, supervisory duties in furtherance of prostitution activity. The nature of this supervisory role quite adequately distinguishes their cases from those decisions[22] which establish the principle that "mere association" is not enough, standing alone, to support a reasonable inference of criminal intent. By the same token, the female appellants were clearly shown to have participated in the prostitution scheme. Although they seldom played supervisory roles, they did furnish the enterprise with its stock in trade. Thus, although their roles were different from those of the male defendants, their participation was no less active. As with the male members of the ring, we have no trouble concluding that a jury could permissibly exclude every reasonable hypothesis of their innocence.[23]
 
 
 56
 Finally, as to the individual severance arguments,[24] we have considered those arguments in light of the entire record and find that joinder was both permissible and not unduly prejudicial as to the appellants who have raised this issue. Our treatment of this issue in Part II A of this opinion adequately states the reasoning underlying this conclusion, since the individual severance arguments do not present us with any factors which we did not consider in evaluating the prejudicial effects attendant to the trial as a whole.III
 
 
 57
 For the reasons set forth, we have concluded that the trial of this case contained no error requiring reversal of the convictions of any of these appellants. Accordingly, the judgment of the lower court is in all respects.
 
 
 58
 AFFIRMED.
 
 
 
 [1]
 As a procedural matter, we should note that there are two indictments involved in this case. The first indictment was returned on February 3, 1975, and forms the basis of the appeal in case No. 75-3387. It contained five counts and charged the following offenses:
 Count I: Conspiracy to conduct a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961 and 1962(d).
 Count II: Association with an interstate enterprise conducting its affairs through a pattern of racketeering, in violation of 18 U.S.C. § 1962(c).
 Count III: Interstate travel from Tampa, Florida, to Cordele, Georgia, in aid of a business enterprise involving prostitution, in violation of 18 U.S.C. § 1952(a)(3).
 Count IV: Interstate travel from Cordele, Georgia, to Tampa, Florida, in aid of a business enterprise involving prostitution, in violation of 18 U.S.C. § 1952(a)(3).
 Count V: Interstate travel from Florida to Pennsylvania in aid of a business enterprise involving prostitution, in violation of 18 U.S.C. § 1952(a)(3).
 The second indictment was returned on March 5, 1975, and forms the basis of the appeal in case No. 75-3364. It was identical to the first indictment with respect to the number and sequence of the counts and the offenses charged therein; the only deviations from the first indictment were with respect to the parties charged as defendants in certain counts. Prior to trial, the district court ordered that the indictments be consolidated for trial pursuant to Rule 13, Fed.R.Crim.P. Because of the substantial similarity between the two indictments and for the sake of convenience, we shall hereinafter speak as though there were only one indictment involved in the proceedings below.
 
 
 [2]
 See Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)
 
 
 [3]
 The Colonial Oaks was apparently something of a dormitory for John Christopher's women: the testimony of Perez and Hoff indicated that all of the female defendants were living in the Colonial Oaks during this period, along with several women who were not tried in the proceedings below
 
 
 [4]
 Hoff related that on occasion she gave her money to Mable Horne, who would pass it on to Herbert Christopher
 
 
 [5]
 As we have recounted in the text supra, Bryant's actions were more than merely supervisory. He was actively involved in the recruitment program as well, which produced, for example, the alleged kidnapping of Barbara Scott Vann
 
 
 [6]
 At this juncture, two sub-paragraphs of another portion of the indictment, which alleged two additional "kidnapping" incidents involving women who never testified, were stricken by the court
 
 
 [7]
 For example, Hoff testified that on occasions Franklin and Wright would sit on top of an automobile while one of the prostitutes practiced her profession inside the car
 
 
 [8]
 The FBI had been able to surveil some of the group's activities in Pennsylvania
 
 
 [9]
 The defendant Mable Horne was not named in this count
 
 
 [10]
 As we noted above, the severance issue in this case is raised before us in two ways. First, the appellants assert collectively, through a joint brief, that their common trial amounted to reversible error as to all of them simply because of the procedural difficulties involved in trying this case with such a large number of defendants and under the difficult conditions discussed infra. Second, two of them assert individualized severance arguments grounded upon particularized characterizations of the prejudice attendant to the trial of their own case in conjunction with the others. At this juncture, we shall discuss only the former aspect of the severance question
 
 
 [11]
 At the request of the defense attorneys, the district court recited for the record the somewhat difficult conditions under which this case was tried:
 I think the record ought to show that unfortunately, in this particular courtroom, there is a sizable column that protrudes to the left of the bench from my position, or to the right to the bench from the position of counsel tables, and the column obstructs the view of the bench on which several of the defendants are seated, both from the bench and from the witness chair, so that it is necessary in order to get a view of all of those participating in the case inside the rail for the witness to step down from the witness chair.
 Tr. IV, 11-12.
 
 
 [12]
 The fifteen defendants at trial were at one time or another identified through the use of eleven different nicknames
 
 
 [13]
 For example, two defendants were named Herbert Lee Christopher and Herbert Lee Bryant, and three defendants shared the "Christopher" surname
 
 
 [14]
 In this connection, Rule 14 is quite different from its companion Rule 8, which deals with true misjoinder in the technical sense. Rule 8(b) states in pertinent part that "(t)wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." A defendant who has been misjoined with others within the meaning of Rule 8(b) is entitled to severance as a matter of law, and the trial court's discretion never enters the picture. See United States v. Laca, 499 F.2d 922 (5th Cir. 1974); see generally C. Wright, Federal Practice and Procedure: Criminal § 144 (1969). Additionally, a severance required by Rule 8(b) will normally become evident at some stage prior to trial, while Rule 14 imposes upon the trial court a continuing duty to entertain the severance issue throughout the trial whenever the needs of justice so require. See Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); United States v. Clark, 480 F.2d 1249 (5th Cir.), cert. denied, 414 U.S. 978, 94 S.Ct. 301, 38 L.Ed.2d 222 (1973). The appellants in this case do not contend nor could they contend that they were misjoined with each other in the technical sense proscribed by Rule 8(b)
 
 
 [15]
 United States v. Lane, 465 F.2d 408, 413 (5th Cir. 1972)
 
 
 [16]
 United States v. Johnson, 478 F.2d 1129, 1131 (5th Cir. 1973)
 
 
 [17]
 Based on United States v. Apollo, 476 F.2d 156 (5th Cir. 1973). The trial of this case was not governed by the new Federal Rules of Evidence. As to whether an Apollo instruction would have been required under the new rules, we express no opinion. See United States v. Brown, 555 F.2d 407 at 423 n.38, slip op. at 4224 n.38 (5th Cir. 1977)
 
 
 [18]
 The original venire in this case included six blacks. One of these was dismissed for cause, and the remaining five were dismissed through the government's use of its peremptory challenges
 
 
 [19]
 The factual underpinnings of the Rule 33 motion here readily distinguish the instant case from United States v. McDaniels, 379 F.Supp. 1243 (E.D.La.1974), a case in which the district judge granted a Rule 33 motion quite similar to the one which is now under review. Putting aside for the moment that McDaniels deals with a district court's treatment of a Rule 33 motion presented to it in the first instance a distinction which we regard as significant in view of the respective roles of trial and appellate jurisprudence we observe that the McDaniels movants presented the court with statistical evidence gleaned from a study of the racial composition of petit juries over the two-year period leading up to and including that case. In the face of such evidence, the McDaniels court was able to make an informed and articulate judgment that the interests of justice mandated that a new trial be held. In the instant case, the district court had no such evidence before it
 
 
 [20]
 As we stated before, Horne did not participate in the journey to Pennsylvania. The testimony at trial indicated that she was pregnant at the time the trip was made
 
 
 [21]
 The sufficiency of the evidence is challenged by the following appellants in individual briefs: John Christopher, Jr., Bryant, McLaurin, Parker, Herbert Christopher, Hamilton, Patricia Williams, Davis and Horne
 
 
 [22]
 E. g., United States v. Irons, 475 F.2d 40 (8th Cir.), cert. denied, 412 U.S. 951, 93 S.Ct. 3020, 37 L.Ed.2d 1004 (1973); United States v. Barfield, 447 F.2d 85 (5th Cir. 1971)
 
 
 [23]
 Female appellants Patricia Williams and Marsha Davis argue that the evidence against them under Count V of the indictment the count which alleged interstate travel to Pennsylvania for the purpose of violating that state's prostitution laws was insufficient because the government failed to prove that Davis and Williams had engaged in prostitution while they were with the group in Pennsylvania. The record does not support this contention. Witness J. J. Hoff, for example, testified that both Davis and Williams were with the entourage in Pennsylvania, and that while there they were "prostituting." Davis and Williams argue that this description was conclusory, and that therefore it cannot, standing alone, support the factual determination that specific instances of prostitution occurred. This is simply untrue. The testimony in question was received without any objection from the defense which would have forced the witness to be more specific. While the word "prostitution" may state a legal conclusion of sorts, its meaning in this context is not sufficiently unclear for us to disallow its use to support the factual conclusion at issue here
 
 
 [24]
 This issue is raised individually by appellants Dorothy Mae Hamilton and Herbert Lee Bryant